Filed 5/7/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SARAH PLOTT KEY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ELIZABETH PLOTT TYLER et al.,<br><br>    Defendants and Respondents. | B283979<br><br>(Los Angeles County<br>Super. Ct. No. BP131447)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 19, 2019, and reported in the Official Reports (___ Cal.App.5th ____) be modified as follows:

On page 55, the paragraph under the heading DISPOSITION is deleted and the following paragraph is inserted in its place:

The probate court's orders (1) striking Key's No Contest Petition under Code of Civil Procedure section

425.16; (2) awarding attorney fees to prevailing parties on their motion to strike under Code of Civil Procedure section 425.16; and (3) denying Key's motion for attorney fees on appeal are reversed.  The case is remanded for further proceedings on Key's petition and for determination of Key's reasonable attorney fees in defending Tyler's appeal in case No. B258055.  On remand, the trial court shall determine whether those fees are to be paid solely from Tyler's share of the Trust estate (if any).  Key is entitled to her costs on this appeal.

This modification changes the judgment.
Appellant's petition for rehearing is denied.

CERTIFIED FOR PUBLICATION.


LUI, P. J.        ASHMANN-GERST, J.        HOFFSTADT, J.

Filed 4/19/19 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SARAH PLOTT KEY, | B283979 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BP131447) |
| v. | |
| ELIZABETH PLOTT TYLER et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County. David J. Cowan, Judge. Reversed and remanded with directions.

Grignon Law Firm, Margaret M. Grignon, Anne M. Grignon; Wershow & Cole and Jonathan A. Wershow for Plaintiff and Appellant.

Magee & Adler, Eric R. Adler; Murphy Rosen and Paul D. Murphy for Defendant and Respondent Elizabeth Plott Tyler.

Silas Isadore Harrington; Williams Iagmin and Jon R. Williams for Defendant and Respondent Jennifer Plott Potz.

_____

Sarah Plott Key (Key) appeals from orders of the probate court (1) striking her petition to enforce a no contest clause in a trust under the "anti-SLAPP" statute (Code Civ. Proc., § 425.16)[1] and (2) denying her motion to recover her attorney fees incurred in defending an earlier unsuccessful appeal filed by respondent Elizabeth Plott Tyler (Tyler). Key and Tyler are sisters and, along with the third sister, respondent Jennifer Plott Potz (Potz), are beneficiaries of a family trust (Trust) that their parents first created in 1999. Tyler was the trustee.

The Trust was purportedly amended in 2007 (2007 Amendment), substantially changing the beneficiaries' rights and effectively disinheriting Key. Key filed a petition in 2011 (Invalidity Petition) seeking a ruling that the 2007 Amendment was a product of undue influence by Tyler. The probate court granted that petition, and this court affirmed that ruling in a nonpublished opinion. (*Key v. Tyler* (June 27, 2016, mod. June 29, 2016, B258055) (*Key v. Tyler I*).)

Following remand, Key filed a petition to enforce the Trust's no contest clause against Tyler (No Contest Petition), claiming that Tyler's judicial defense of the invalid 2007 Amendment implicated that clause. Citing the same section of the Trust that contains the no contest clause, Key also sought an award of her attorney fees on appeal, which she claimed she incurred while resisting Tyler's attack on the original Trust provisions.

Tyler responded with an anti-SLAPP motion. Tyler argued that Key's No Contest Petition arose from Tyler's protected

_____

[1] "SLAPP" is an acronym for "[s]trategic lawsuit against public participation." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1.)

2

litigation conduct under Code of Civil Procedure section 425.16, subdivision (e)(3), and that Key could not show a likelihood of success on her No Contest Petition for a variety of reasons, including that Key, not Tyler, had initiated the proceedings challenging the validity of the 2007 Amendment. Tyler also opposed Key's request for attorney fees.

The probate court granted Tyler's anti-SLAPP motion and denied Key's motion for attorney fees. The court rejected Key's argument that the anti-SLAPP statute does not apply to petitions to enforce no contest provisions in probate court. The court also found that Key failed to show a probability of success on her No Contest Petition because Tyler's defense against the Invalidity Petition that *Key* filed was not an enforceable "direct contest" of the Trust. (Prob. Code, § 21311.)[2] With respect to the request for attorney fees, the court ruled that Key had failed to identify any statutory or equitable basis for the request.

We reverse both orders. We agree with the probate court (and with a recent decision by Division Five of this district) that the anti-SLAPP statute applies to a petition such as Key's seeking to enforce a no contest clause. However, we conclude that Key adequately demonstrated a likelihood of success under the second step of the anti-SLAPP procedure. Tyler's judicial defense of the 2007 Amendment that she procured through undue influence meets the Trust's definition of a contest that triggered the no contest clause. And, under sections 21310 and 21311, that clause is enforceable against Tyler because the pleadings that Tyler filed defending the 2007 Amendment constituted a "direct contest" of the Trust provisions that the amendment purported to

_____

[2] Subsequent undesignated statutory references are to the Probate Code.

3

alter. (§ 21310, subd. (b)(5).) Key also provided sufficient evidence that Tyler lacked probable cause to defend the 2007 Amendment. (§ 21311, subd. (a)(1).) The findings of the probate court concerning Tyler's undue influence, which this court affirmed, provide a sufficient basis to conclude that Key has shown a probability of success on her No Contest Petition.

The same section of the Trust that contains the no contest clause also provides that expenses to resist any "contest" or "attack" on a Trust provision shall be paid from the Trust estate. We conclude that this section provides Key with the contractual right to seek reimbursement of her attorney fees incurred in resisting Tyler's appeal of the probate court's ruling invalidating the 2007 Amendment. We therefore reverse the probate court's rulings and remand for the court to determine Key's reasonable attorney fees and for further proceedings on Key's No Contest Petition.

## BACKGROUND

### 1. Facts Concerning Tyler's Undue Influence[3]

Tyler, Key, and Potz are the daughters of Thomas and Elizabeth Plott, who owned a successful family nursing home business. Thomas and Elizabeth created the Trust in 1999 and amended it in 2002 and 2003. Thomas died in 2003. (*Key v. Tyler I*, *supra*, B258055.)

---

[3] This factual summary is based primarily on the probate court's statement of decision dated April 25, 2014 (Statement of Decision), following the trial on Key's Invalidity Petition and on this court's prior opinion in *Key v. Tyler I*, *supra*, B258055. We cite that opinion pursuant to California Rules of Court, rule 8.1115(b)(1), which permits citation of nonpublished opinions when relevant under the doctrines of res judicata or collateral estoppel.

4

The Trust provided that, upon the death of the first spouse, the estate would be divided into three separate subtrusts: the survivor's trust; the marital trust; and the exemption trust. The marital trust and the exemption trust became irrevocable upon the first spouse's death, but the survivor's trust was revocable. The assets allocated to the three trusts were required to be equivalent. As of January 2006, the Trust's assets were worth over $72 million.[4] (*Key v. Tyler I*, *supra*, B258055.)

Article Fourteen (Article 14) of the Trust contains a "Disinheritance and No Contest Clause" (No Contest Clause). That clause provides in pertinent part that, "if any devisee, legatee or beneficiary under this Trust . . . directly or indirectly (a) contests either Trustor's Will, this Trust, any other trust created by a Trustor, or in any manner attacks or seeks to impair or invalidate any of their provisions, . . . then in that event Trustors specifically disinherit each such person, and all such legacies, bequests, devises, and interest given under this Trust to that person shall be forfeited as though he or she had predeceased the Trustors without issue, and shall augment proportionately the shares of the Trust Estate passing under this Trust to, or in trust for, such of Trustors' devisees, legatees, and beneficiaries who have not participated in such acts or proceedings."

Following Thomas's death, Tyler, a lawyer, "actively sought to have Mrs. Plott amend the survivor's trust to effectively exclude Key." (*Key v. Tyler I, supra,* B258055.) Tyler was vice-president of operations for the nursing home business and was a

---

[4] As mentioned in *Key v. Tyler I*, *supra*, B258055, the family's nursing home business ultimately sold at a probate court auction for $55 million.

5

principle and founding member of Tyler & Wilson, the law firm that provided legal services to the business. Mrs. Plott depended on Tyler for information related to the business and for legal advice. Mrs. Plott also was dependent on Tyler to carry on the family business, which Mrs. Plott considered her legacy. Tyler "exploited her knowledge of the family nursing home business to manipulate Mrs. Plott." (*Ibid.*)

Beginning in late 2006, Tyler actively participated in efforts to procure an amendment to the Trust that made significant changes to the distribution of the survivor's trust. Tyler controlled the communications concerning the amendment between Mrs. Plott and Allan Cutrow, her estate planning lawyer, and with his firm, Mitchell, Silberberg & Knupp (MSK). Tyler was the "gatekeeper between MSK and Mrs. Plott." Cutrow "was told to route all inquiries through Tyler & Wilson and not to contact Mrs. Plott directly." (*Key v. Tyler I, supra,* B258055.) Every meeting that Mrs. Plott attended with MSK concerning the 2007 Amendment was also attended by Tyler or by Tyler's associate. Tyler also "often created time pressure on Mrs. Plott by limiting Ms. Tyler's availability or intentionally shortening the time in which to have meetings, thus putting pressure on decisions to be made by Mrs. Plott."

During the drafting process, Tyler "actively revised" the 2007 Amendment, "directly instructing Mr. Cutrow to include specific language and percentages in the final document." The probate court found that there was "NO evidence that the [2007 Amendment] represents the desires or choices of Mrs. Plott." The court based that conclusion on the totality of the court's findings concerning Tyler's active procurement of the 2007 Amendment, "most importantly the lack of any evidence originating directly

6

from Mrs. Plott without the participation or interference of Ms. Tyler."

The final 2007 Amendment unduly benefited Tyler. As amended in 2003, the Trust provided for an equal division of property between the three daughters. However, the 2007 Amendment replaced the relevant provision of the Trust with a new distribution scheme that gave Tyler 65 percent of the business assets and Potz 35 percent. Key received a lump sum gift of $1 million. (*Key v. Tyler I, supra,* B258055.)

The 2007 Amendment also gave Tyler all the contents of Mrs. Plott's residence, replacing a provision that personal property was to be split equally, or in " 'such manner as [the children] shall agree.' " And the 2007 Amendment purportedly forgave a $2.5 million debt that Tyler owed to the martial trust, effectively giving Tyler a benefit of $1,666,666 and imposing a loss on Key of $833,333. (*Key v. Tyler I, supra,* B258055.) The 2007 Amendment included this loan forgiveness provision although Cutrow had told Mrs. Plott that the note was owned one-third by each daughter through the marital trust (which was irrevocable), and therefore could not be forgiven. The probate court found that there was "no competent evidence that Mrs. Plott wanted this term in the 2007 . . . Amendment."

Mrs. Plott signed the 2007 Amendment on May 25, 2007. In 2010 she was diagnosed with dementia. She died on June 27, 2011. (*Key v. Tyler I, supra,* B258055.)

## 2. Key's Invalidity Petition

Key filed her Invalidity Petition on November 1, 2011. Tyler opposed the petition. In her capacity as trustee, Tyler filed a response and objections to the Invalidity Petition in which she argued that Mrs. Plott "was not susceptible to any undue

7

influence of others" and that Mrs. Plott's "testamentary wishes were embodied in the 2007 Amendment."

Tyler appeared at the trial on the Invalidity Petition through counsel both individually and in her capacity as trustee. She filed some pleadings in both capacities. Following a 17-day trial, the probate court issued its 67-page Statement of Decision stating its findings and granting the Invalidity Petition. This court issued its opinion affirming that decision on June 27, 2016. (*Key v. Tyler I, supra,* B258055.)

3. **Tyler's Anti-SLAPP Motion**

Following remand, Key filed her No Contest Petition. Tyler responded with a motion to strike the entire petition under Code of Civil Procedure section 425.16, which the probate court heard on May 16, 2017.

The court ruled that the anti-SLAPP statute applies to actions to enforce a no contest clause. The court recognized that the anti-SLAPP procedure and a no contest enforcement action are in some ways "antithetical to one another." However, the court concluded that Probate Code section 1000 makes the Code of Civil Procedure applicable to probate proceedings unless the Probate Code indicates otherwise, and there is "nothing in the no contest law, which says that it shouldn't be subject to the anti-SLAPP law."

With respect to the second step of the anti-SLAPP procedure, the court found that Key failed to meet her burden to show a probability of success on her No Contest Petition. The court concluded that Key could not enforce the Trust's No Contest Clause under section 21311 because Tyler "did not file a direct contest. Rather, she defended against a petition that Ms. Key filed." The court also found that Key had not shown that Tyler

8

lacked probable cause to defend the 2007 Amendment, as section 21311 requires. The court noted that the prior judge who decided the Invalidity Petition had "indicated that it was a difficult case to decide, which, itself, gives this court, which did not try the case, some pause as to whether—how much of a slam dunk it was or . . . how much the defense was without probable cause."**5**

### 4.  Key's Motion for Attorney Fees

Following remand, Key also filed a motion for the attorney fees she incurred in defending Tyler's appeal of the probate court's decision granting her Invalidity Petition. The probate court heard that motion along with the anti-SLAPP motion.

The court denied the motion. The court concluded that Key failed to show a legal basis for a fee award under any of the grounds that she raised, including Probate Code section 17211, subdivision (b); Civil Code section 1717; the "common benefit" theory; the court's inherent power; or Code of Civil Procedure section 128.5. With respect to Civil Code section 1717, which addresses attorney fees authorized by contract, the court acknowledged that "a trust is a kind of contract." However, the court concluded that the pleading on which Key prevailed was "not a breach of contract case. It was a trust case. It was that she exercised—or she could not prove that it was not without undue influence."

## DISCUSSION

### 1.  The Anti-SLAPP Procedure

Code of Civil Procedure section 425.16 provides for a "special motion to strike" when a plaintiff asserts claims against

---

**5** By the time of the anti-SLAPP motion, the judge who had decided the Invalidity Petition, Judge Reva Goetz, had retired. The anti-SLAPP motion was heard by Judge David J. Cowan.

a person "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (Code Civ. Proc., § 425.16, subd. (b)(1).) Such claims must be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid*.)

Thus, ruling on an anti-SLAPP motion involves a two-step procedure. First, the "moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).) At this stage, the defendant must make a "threshold showing" that the challenged claims arise from protected activity. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.)

Second, if the defendant makes such a showing, the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral, supra*, 1 Cal.5th at p. 396.) Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid*.) The plaintiff's showing must be based upon admissible evidence. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) Thus, the second step of the anti-SLAPP analysis is a "summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) In this step, a plaintiff "need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif*

10

(2006) 39 Cal.4th 260, 291, quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

Code of Civil Procedure section 425.16, subdivision (e) defines the categories of acts that are in " 'furtherance of a person's right of petition or free speech.' " Those categories include "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," and "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (Code Civ. Proc., § 425.16, subd. (e)(1)–(2).) An appellate court reviews the grant or denial of an anti-SLAPP motion under the de novo standard. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).)

**2.     The Enforceability of No Contest Clauses**

Both parties cite to the history of legislation governing no contest clauses for its relationship to the anti-SLAPP statute and for its relevance to determining whether the No Contest Clause is enforceable against Tyler. We therefore briefly describe pertinent portions of that history.

A no contest clause operates as a disinheritance device: " '[I]f a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or devise provided under the instrument.' " (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 422 (*Donkin*), quoting *Burch v. George* (1994) 7 Cal.4th 246, 265.) "Such clauses promote the public policies of honoring the intent of the donor and discouraging litigation by persons whose

11

expectations are frustrated by the donative scheme of the instrument." (*Donkin,* at p. 422.)

These policies are in tension with the policy interests of "avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument." (*Donkin, supra,* 58 Cal.4th at p. 422.) The common law of California balanced these interests by permitting the enforcement of no contest clauses so long as they were " 'not prohibited by some law or opposed to public policy.' " (*Ibid.,* quoting *In re Estate of Kitchen* (1923) 192 Cal. 384, 389.) Because they cause a forfeiture, such clauses were strictly construed. (*Kitchen,* at pp. 389–390.)

The Legislature partially codified the law concerning no contest clauses in 1989. (*Donkin, supra,* 58 Cal.4th at p. 422.) Part of the codification included the establishment of a "safe harbor" declaratory relief procedure. (*Id.* at p. 423, fn. 6.) Using that procedure, a beneficiary could "apply to the court for a determination whether a particular motion, petition, or other act by the beneficiary would be a contest within the terms of a no contest clause." (Former § 21305, subd. (a); Stats. 1989, ch. 544, § 19.) A no contest clause was not enforceable against such an application so long as it "did not require a determination of the merits of the motion, petition, or other act by the beneficiary." (Former § 21305, subd. (b); Stats. 1989, ch. 544, § 19.)

The statutory scheme governing no contest clauses became increasingly complex over the next several decades. (*Donkin, supra,* 58 Cal.4th at pp. 423–424.) The Legislature enacted amendments "specifically identifying various types of claims for which a safe harbor proceeding was expressly available and further identifying specific types of actions against which a no

12

contest clause was not enforceable." (*Id.* at p. 423.) The complexity led to uncertainty, which also contributed to the number of safe harbor declaratory relief applications. The frequency of such applications "added an additional layer of litigation to probate matters, which undermined the goal of a no contest clause in reducing litigation by beneficiaries." (*Id.* at p. 424.)

In 2008 the Legislature adopted recommendations of the California Law Revision Commission (Commission) by repealing the law on no contest provisions and enacting a new set of statutes. (*Donkin, supra,* 58 Cal.4th at p. 426; Stats. 2008, ch. 174, §§ 1, 2, p. 567.) The new legislation simplified the regulatory regime by more narrowly defining the types of challenges that *could* be subject to a no contest clause, replacing "the existing 'open-ended definition of "contest," combined with a complex and lengthy set of exceptions.' " (*Donkin*, at pp. 425–426, quoting Recommendation: Revision of No Contest Clause Statute (Jan. 2008) 37 Cal. Law Revision Com. Rep. (2007) p. 392 (Commission 2007 Recommendation).) The new statutes precluded the enforcement of no contest clauses against an "indirect" contest (i.e., a contest that indirectly " 'attacks the validity of an instrument by seeking relief inconsistent with its terms' "). (*Donkin*, at p. 424, quoting *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 605; *Donkin*, at p. 426.) The new legislation also discontinued the safe harbor procedure. (*Donkin,* at p. 427.)

Under current law, a no contest clause is enforceable against a "direct contest that is brought without probable cause." (§ 21311, subd. (a)(1).) Section 21310, subdivision (b) defines a "direct contest." The definition includes a "contest that alleges the invalidity of a protected instrument or one or more of its

13

terms" based upon the "revocation of a trust pursuant to Section 15401." (§ 21310, subd. (b)(5).) "Contest" is defined as "a pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced." (§ 21310, subd. (a).) A "pleading" is further defined as a "petition, complaint, cross-complaint, objection, answer, response, or claim." (§ 21310, subd. (d).)

### 3. The Anti-SLAPP Statute Applies to Key's No Contest Petition

There is no dispute that Key's No Contest Petition arises from statements made "before a . . . judicial proceeding" and "in connection with an issue under consideration or review by a . . . judicial body." (Code Civ. Proc., § 425.16, subd. (e)(1)–(2).) Key's No Contest Petition challenges Tyler's judicial defense of the 2007 Amendment against Key's successful effort to obtain a declaration that the amendment was invalid. The No Contest Petition is based on the theory that Tyler's judicial defense of the 2007 Amendment contested the validity of the Trust provisions that the amendment purported to alter, therefore authorizing Tyler's disinheritance under the Trust's No Contest Clause and Probate Code sections 21310 and 21311.

Thus, Key's No Contest Petition challenges Tyler's litigation conduct. That is necessarily so because section 21310 specifically defines a "contest" as a "pleading filed with the court." Unless proceedings to enforce no contest provisions are excluded from the scope of the anti-SLAPP statute, Tyler has met her burden under step one of the anti-SLAPP procedure to show that Key's petition arises from protected conduct.

Key claims that the anti-SLAPP statute does not apply to petitions to enforce no contest clauses because the anti-SLAPP

14

procedure is inconsistent with the probate statutes governing such clauses. Key points out that the purpose of the anti-SLAPP procedure is to weed out meritless claims arising from protected conduct by permitting a challenge to such claims at the beginning of a lawsuit. Such a challenge necessarily involves "an additional layer of litigation, with associated costs and delays." She argues that this additional litigation is inconsistent with the Legislature's intent to streamline the resolution of no contest petitions by eliminating the safe harbor procedure in the prior law.

Division Five of this district recently rejected a similar argument. In *Urick v. Urick* (2017) 15 Cal.App.5th 1182 (*Urick*), the court held that "the plain language of the anti-SLAPP statute applies" to petitions to enforce no contest clauses. (*Id.* at p. 1186.) The court concluded that, although "[t]here may be valid reasons to exempt enforcement of no contest clauses from the anti-SLAPP statute," it is for the Legislature to make that decision. (*Id.* at p. 1195.)

We agree with the court in *Urick.* Unlike certain other kinds of actions, the anti-SLAPP statutory scheme does not create any exception to the anti-SLAPP procedure for actions to enforce no contest clauses. (See Code Civ. Proc., § 425.17, subds. (b)–(c) [establishing exceptions for actions brought in the public interest and for certain actions based upon commercial speech].) A judicial challenge to a trust or other protected instrument involves a "writing made before a . . . judicial proceeding." (Code Civ. Proc., § 425.16, subd. (e)(1).) An action to enforce a no contest provision is necessarily based upon such conduct, and therefore falls within the express statutory definition of conduct

that arises from protected petitioning conduct under step one of the anti-SLAPP procedure.

While Key presents reasonable arguments for why the anti-SLAPP statute should not apply to actions to enforce no contest provisions, those arguments are for the Legislature to consider. Key points out that, based upon the statutory definition of a "contest" as a "pleading," all actions to enforce no contest clauses will necessarily be subject to the anti-SLAPP procedure. While that is so, it is simply another way of saying that all actions to enforce no contest provisions arise from protected petitioning conduct. The protection of such conduct is of course one of the goals of the anti-SLAPP statute, which our Legislature has directed "shall be construed broadly." (Code Civ. Proc., § 425.16, subd. (a).) In light of that legislative directive and the stated purpose of the anti-SLAPP statute, we cannot say that this result is so "absurd" as to be "clearly contrary to the Legislature's intent." (*Urick, supra,* 15 Cal.App.5th at p. 1195, quoting *Cassel v. Superior Court* (2011) 51 Cal.4th 113, 136.)

Our Supreme Court rejected similar arguments in *Jarrow Formulas, Inc. v. La Marche* (2003) 31 Cal.4th 728 (*Jarrow*) in holding that the anti-SLAPP statute applies to malicious prosecution actions. The court recognized that "section 425.16 potentially may apply to every malicious prosecution action, because every such action arises from an underlying lawsuit, or petition to the judicial branch." (*Id.* at pp. 734–735.) Nevertheless, the court concluded that the " 'plain language of the statute establishes what was intended by the Legislature.' " (*Id.* at p. 735, quoting *People v. Statum* (2002) 28 Cal.4th 682, 690.) The court also noted that giving effect to the plain statutory language "accords with the Legislature's specific

16

decision not to include malicious prosecution claims in the statutory list of actions to which '[t]his section shall not apply.' " (*Jarrow*, at p. 735, quoting Code Civ. Proc., § 425.16, subd. (d).)

Key also argues that the "availability of the anti-SLAPP procedure may result in the filing of non-meritorious contest litigation" because an unsuccessful contestant can use an anti-SLAPP motion to "evade the consequences of a meritless contest." The conclusion is questionable because a meritless contest will still be actionable if there is evidence in the second step of the anti-SLAPP procedure showing that the contestant lacked probable cause to bring the contest. In any event, if the Legislature concludes that the anti-SLAPP procedure tilts the balance involved in the regulation of no contest clauses too far away from "discouraging litigation" and too far toward promoting "full access of the courts to all relevant information," it can change the law. (*Donkin, supra,* 58 Cal.4th at p. 422.)

Key also makes various statutory interpretation arguments that she claims the court in *Urick* did not consider. First, she points out that the court in *Urick* correctly noted that the " 'general rules of the Code of Civil Procedure do not apply when the Probate Code provides special rules.' " (*Urick, supra,* 15 Cal.App.5th at pp. 1194–1195, quoting *Swaithes v. Superior Court* (1989) 212 Cal.App.3d 1082, 1088–1089; see Prob. Code, § 1000.)[6] She argues that the court in *Urick* incorrectly applied

---

[6] Section 1000, subdivision (a) provides that, except to the extent that the Probate Code provides applicable rules, "the rules of practice applicable to civil actions . . . apply to, and constitute the rules of practice" in proceedings under the Probate Code. That subdivision also directs that "[a]ll issues of fact joined in probate proceedings shall be tried in conformity with the rules of practice in civil actions."

that rule because it mistakenly concluded that "no provision of the Probate Code has been shown to be inconsistent with the anti-SLAPP provisions." (*Urick*, at p. 1195.)

Key argues that section 1022 creates such inconsistency. That section provides that "[a]n affidavit or verified petition shall be received as evidence when offered in an uncontested proceeding under this code." Key claims that this provision is inconsistent with the anti-SLAPP statute because, by implication, it precludes the use of affidavits in *contested* proceedings, and a contested anti-SLAPP motion involves the use of affidavits.[7] We do not find an inconsistency that would preclude the use of the anti-SLAPP procedure in probate matters.

Key cites *Estate of Bennett* (2008) 163 Cal.App.4th 1303 (*Bennett*) for the proposition that section 1022 prohibits the use of affidavits for *any* contested motion under the Probate Code. We do not believe the holding in that case stretches that far.

In *Bennett*, the probate court granted a motion to set aside a settlement agreement on the ground that it was the result of fraud and duress and provided inadequate consideration. The court ruled on the parties' declarations, rejecting the respondent's argument that the motion involved " 'factual issues which require determination after [a] full evidentiary hearing during which documentary evidence and testimony will have to be presented.' " (*Bennett, supra,* 163 Cal.App.4th at p. 1307.) The appellate court reversed. The court first noted that "[i]t has long been the rule" in probate matters that " 'affidavits may not be used in evidence unless permitted by statute.' " (*Bennett,* at pp. 1308–1309,

---

[7] Our discussion of affidavits applies equally to declarations, which are the statutory equivalent of affidavits. (Code Civ. Proc., § 2015.5.)

18

quoting *Estate of Fraysher* (1956) 47 Cal.2d 131, 135.)  The court rejected the petitioners' argument that Code of Civil Procedure section 2009 provided authority to decide the motion based upon the declarations, interpreting Probate Code section 1022 to authorize the use of declarations "only in an 'uncontested proceeding.' "[8]  (*Bennett*, at p. 1309.)

The "contested proceeding" at issue in *Bennett* was a motion in which the *facts asserted in the declarations* were contested.  It is logical to conclude that, by authorizing the use of affidavits in "uncontested proceedings," section 1022 is at least impliedly inconsistent with the use of affidavits to decide contested facts.  However, the anti-SLAPP procedure does not require—or even permit—a court to decide contested facts based upon affidavits.  Rather, like a motion for summary judgment, a motion to strike under the anti-SLAPP statute requires a court simply to determine whether the plaintiff's showing, "if accepted by the trier of fact," would be sufficient to sustain a favorable judgment.  (*Baral, supra,* 1 Cal.5th at p. 396.)  Such a decision must be made *without* resolving evidentiary conflicts.  (*Ibid*.)  Section 1022 does not conflict with the use of affidavits in such a procedure, where the truth of the facts themselves are not contested.

At a minimum, section 1022 is not so clearly inconsistent with the anti-SLAPP procedure that one may infer from that section that the Legislature intended to exclude probate proceedings from the scope of the anti-SLAPP statute.  Section 1000 explains that the rules applicable to civil actions apply to probate proceedings "[e]xcept to the extent that this code provides

_____

[8] Code of Civil Procedure section 2009 permits the use of affidavits for a number of purposes, including "upon a motion."

applicable rules." The Probate Code does not itself provide rules for anything akin to an anti-SLAPP procedure, or indeed any other procedure for a preliminary determination of the strength of a petitioner's case prior to deciding disputed facts. Under section 1000, the absence of such rules in the Probate Code suggests that the anti-SLAPP statute should apply.

This conclusion is consistent with the widespread use of the summary judgment procedure in probate matters. Like the anti-SLAPP statute, the statute governing summary judgment motions specifically provides for the use of affidavits. (See Code Civ. Proc., §§ 425.16, subd. (b)(2), 437c, subd. (b)(1).) And, like the anti-SLAPP statute, the summary judgment statute does not permit the determination of contested facts based upon the affidavits, but allows a motion to be granted only if there is "no triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) Despite Probate Code section 1022, summary judgment proceedings in probate court are commonplace. (See, e.g., *Estate of Duke* (2015) 61 Cal.4th 871, 877 [appeal from summary judgment in probate court]; *Katzenstein v. Chabad of Poway* (2015) 237 Cal.App.4th 759, 764 [probate court denied a motion for summary judgment and granted a motion for summary adjudication]; *Estate of Molino* (2008) 165 Cal.App.4th 913, 921 [appeal from a summary judgment entered by the probate court]; *Estate of Myers* (2006) 139 Cal.App.4th 434, 436 [same]; *Estate of Coleman* (2005) 129 Cal.App.4th 380, 385 [same]; *Estate of Cleveland* (1993) 17 Cal.App.4th 1700, 1703–1704 [same]; *Estate of Lane* (1970) 7 Cal.App.3d 402, 404 [same]; see also Ross & Cohen, Cal. Practice Guide: Probate (The Rutter Group 2018) ¶ 15:228, p. 15-102 ["A motion for summary

20

judgment may, in an appropriate case, be particularly attractive to will proponents facing a will contest"].)

Key presents another statutory interpretation argument based upon the wording of the anti-SLAPP statute itself. That statute states that a "cause of action against a *person*" arising from protected conduct is subject to a special motion to strike. (Code Civ. Proc., § 425.16, subd. (b)(1), italics added.) Key argues that this language limits the anti-SLAPP procedure to actions that are in personam in nature, making it inapplicable to actions under the Probate Code, which have the character of in rem proceedings. (See *Estate of Wise* (1949) 34 Cal.2d 376, 385 [an heirship decree is " 'not against persons as such, but against or upon the thing or subject matter itself' "], quoting 11A Cal.Jur. § 73, p. 135.)

This argument, while intriguing, reads too much into the use of the term "person" in the statute and ultimately is inconsistent with the purpose of the anti-SLAPP procedure. The anti-SLAPP statute itself does not distinguish between in rem and in personam actions. It requires only that a cause of action against a "person" arise from a protected "act of the person." An action can arise from the personal exercise of a protected constitutional right whether the action is intended to impose damages for an alleged tort or to adjudicate the person's right to property.

Actions to enforce no contest clauses illustrate the point. While such actions determine the right to inherit particular property, by definition they also challenge the exercise of a specific protected constitutional right—the right to petition the government through the courts. Protecting that right from lawsuits that threaten to chill its exercise is of course an

21

expressed purpose of the anti-SLAPP statute. (Code Civ. Proc., § 425.16, subd. (a).) The threat of facing a petition seeking forfeiture of an inheritance is certainly capable of chilling resort to the judicial process; indeed, that is the point of a no contest clause.

Key's argument that the anti-SLAPP statute should not apply to probate proceedings because they are in rem in nature also ignores that actions under the Probate Code can include the prospect of significant personal damages based upon individual conduct. In particular, section 859 permits damages of "twice the value of the property recovered by an action under this part" as well as attorney fees following a finding that a "person" has disposed of a decedent's property "by the use of undue influence in bad faith or through the commission of elder or dependent financial abuse." Such an action seeking individual damages cannot fairly be characterized as anything other than an action "against a person," regardless of whether the underlying probate proceedings are conceptually in rem. (See *Greco v. Greco* (2016) 2 Cal.App.5th 810, 825–826 [applying the anti-SLAPP statute to a probate petition that asserted a claim for misrepresentations by a trustee].)

Like the court in *Urick*, we "appreciate the strength of the argument" in favor of exempting actions to enforce no contest provisions from the scope of the anti-SLAPP statute. (*Urick, supra,* 15 Cal.App.5th at p. 1186.) However, the decision to create such an exemption involves policy judgments that are the province of the Legislature to make. None of Key's arguments provides a ground to ignore the plain language of the anti-SLAPP statute, which applies by its terms to an action such as this. We therefore conclude that Tyler met her burden under step one of

22

the anti-SLAPP procedure to show that Key's No Contest Petition arises from protected conduct.

## 4.     Key Has Sufficiently Shown a Probability of Success Under the Second Step of the Anti-SLAPP Procedure

Having decided that Tyler has met her burden to show that Key's claim arises from protected conduct, we must determine whether Key has met her burden under step two of the anti-SLAPP procedure to show a probability that she will prevail on her No Contest Petition.  We conclude that she has.

Tyler presents a number of legal challenges to the viability of Key's petition.  First, Tyler argues that a "direct contest" under section 21310 must involve conduct that *initiates* a judicial action to obtain "affirmative relief."  Thus, she claims that her *defense* of the 2007 Amendment against Key's effort to invalidate it was not a direct contest challenging the validity of any Trust provisions.  Second, she claims that she filed her pleadings defending the 2007 Amendment in her capacity as a trustee, and her conduct therefore does not meet the statutory definition of a contest as a "pleading filed with the court by a *beneficiary*." (§ 21310, subd. (a), italics added.)  Finally, she claims that her conduct in defending the 2007 Amendment was protected by the litigation privilege.  We reject each of these legal arguments.

We also conclude that Key has provided adequate evidentiary support for the merits of her No Contest Petition.  Tyler claims that Key did not support her anti-SLAPP opposition with admissible evidence.  However, such evidence exists in the form of the probate court's Statement of Decision and this court's opinion affirming it.  The facts established by those decisions are sufficient to show a probability of success on Key's petition.

## A. Tyler's judicial defense of the 2007 Amendment was a "direct contest" of the Trust provisions that the 2007 Amendment purported to replace.

Tyler's defense of the 2007 Amendment clearly falls within the scope of the Trust's No Contest Clause. As discussed above, Article 14 of the Trust operates to "specifically disinherit" any "devisee, legatee or beneficiary" who "contests either Trustor's Will, this Trust, any other trust created by a Trustor, or in any manner attacks or seeks to impair or invalidate any of their provisions." By obtaining the 2007 Amendment through undue influence and then defending that amendment in court, Tyler sought to "impair" and "invalidate" the provisions of the original Trust that the 2007 Amendment purported to replace. The No Contest Clause therefore disinherits Tyler if it is enforceable against her.

Under section 21311, the No Contest Clause was enforceable only if Tyler's conduct amounted to a "direct contest" of the Trust brought without probable cause. Section 21310 defines a "direct contest" as a contest that "alleges the invalidity of a protected instrument or one or more of its terms" based on certain enumerated grounds, including the "revocation of a trust pursuant to Section 15401."[9]  (§ 21310, subd. (b)(5).)

---

[9] Section 15401 provides that a trust may be revoked by complying with any method provided in the trust instrument, or, unless the trust explicitly provides the only method of revocation, by delivering a writing signed by the settlor to the trustee. (§ 15401, subd. (a)(1)–(2).)  The power of revocation includes the power to modify. (§ 15402; *Heifetz v. Bank of America Nat. Trust & Sav. Assn.* (1957) 147 Cal.App.2d 776, 781–782.)

24

Tyler's defense of the 2007 Amendment, had it been successful, would have had the effect of revoking paragraph C of article four of the Trust, which the 2007 Amendment purported to replace. Although the 2007 Amendment was labeled an amendment, by making that change its effect was to revoke Key's right to inherit 33 1/3 percent of the estate through the residual Trust and to replace it with the right to inherit "the lesser of $1,000,000, or 5% of the then Survivor's Trust Estate less any amount owed on any outstanding promissory note in favor of the Surviving Trustor." (See *Key v. Tyler I, supra,* B258055.) The effect of this change is what matters, not the label attached to it. (See *Urick, supra,* 15 Cal.App.5th at pp. 1187, 1197 [rejecting the argument that the trustee's petition to "reform the trust" did not seek to invalidate it, and concluding that the effect of her action "controls over the label that she gave to the remedy she sought"].)

Tyler's pleadings defending the 2007 Amendment by "alleg[ing] the invalidity of a protected instrument" (i.e., the original Trust) therefore met the statutory definition of a direct contest. (§ 21310, subds. (a)–(b). Nothing in the language of sections 21310 or 21311 suggests that a direct contest is limited to an action that a beneficiary *initiates*. To the contrary: Pleadings amounting to a "contest" under section 21310 can include responsive pleadings such as a "cross-complaint, objection, answer [or] response." (§ 21310, subd. (d).)

Nor is there any reason to assume that the Legislature intended such a limitation. As Key points out, a trustee does not need judicial assistance to alter the provisions of a trust through deceptive or manipulative conduct, such as a fraudulent revocation or, as here, an amendment obtained through undue influence. Because a trust is designed to be administered by a

trustee outside of probate, any judicial contest concerning a trustee's improper attempt to alter the trust will ordinarily be initiated by a beneficiary who is adversely affected by the trustee's conduct. In that case, the trustee's defense of a bogus change presents no less a threat to the settlor's intent for the distribution of his or her property than a judicial contest initiated by a beneficiary who is unhappy with the original trust terms.

This conclusion is also supported by the case law. In *Estate of Gonzalez* (2002) 102 Cal.App.4th 1296 (*Gonzalez*), a beneficiary presented a 1998 will for probate that he had obtained from his father through undue influence. The will purported to replace a 1992 will that contained a no contest clause. The appellate court concluded that, by offering the 1998 will to probate, the beneficiary brought a "contest" seeking revocation because "the 1998 will revoked all prior wills, including the 1992 will with the no contest clause." (*Id.* at p. 1303.) Similarly, here, Tyler's attempt to enforce the 2007 Amendment that she obtained through undue influence amounted to a direct contest seeking revocation of the pertinent terms in the original Trust.[10]

The court in *Gonzalez* cited *Estate of Bergland* (1919) 180 Cal. 629 (*Bergland*). In that case, a beneficiary unwittingly offered a forged will for probate that purported to supersede prior wills, one of which included a no contest clause. The court held

_____

[10] The trial court distinguished *Gonzalez* on the ground that it was decided before the change in the governing law in 2010. Tyler makes the same argument on appeal. However, the court's reasoning in *Gonzalez*—that judicial action to enforce a new instrument obtained through undue influence amounts to a "contest" challenging the validity of the original instrument— applies equally to the definition of a direct contest under current law. (*Gonzalez, supra*, 102 Cal.App.4th at p. 1303.)

26

that the daughter's attempt in good faith to probate the later will did not fall within the forfeiture clause.  (*Id.* at p. 634.)  However, the court also noted that, "[i]f an attempt were made *knowingly* to probate a spurious will of a later date which purported to distribute the testator's estate in a manner different from that of the genuine will, such an attempt would quite certainly come within the language of the forfeiture clause as an attempt to defeat the provisions of the will."  (*Ibid.*, italics added.)[11]

That principle applies here.  Tyler defended a spurious Trust amendment in court in an attempt to defeat the provisions of the original Trust.  For purposes of enforcing the No Contest Clause, it does not matter that Tyler's attempt to enforce the spurious amendment through judicial proceedings began with a petition filed by Key.

---

[11] The holding in *Bergland* was incorporated into the initial 1989 legislation codifying the enforcement of no contest clauses.  (See Recommendation Relating to No Contest Clauses (Jan. 1989) 20 Cal. Law Revision Com. Rep. (1990) (Revision Report) pp. 12–13; former § 21306, Stats. 1989, ch. 544, § 19.)  The Commission characterized *Bergland* as holding that "a no contest clause is not enforceable against a person who, in good faith, contests a will on the ground of . . . revocation by execution of a subsequent will." (Revision Report, at pp. 12–13 & fn. 9.)  That description of the good faith exception presumes that revocation through an attempt to enforce a subsequent bogus instrument would otherwise trigger a no contest provision.  In place of a good faith exception, the new legislative scheme provided that a no contest clause was not enforceable against contests based on forgery or revocation that were brought with *probable cause*.  (See former § 21306; Stats. 1989, ch. 544, § 19.)

**B.**   *Tyler defended the validity of the 2007 Amendment in her capacity as a beneficiary.*

Tyler's argument that she defended the 2007 Amendment only in her capacity as a trustee is contradicted by the record. Tyler submitted various trial pleadings, including her trial brief, "individually" and as the trustee. In addition, following the trial, Tyler submitted a 33-page "Request for Statement of Decision or, Alternatively, Objections to Proposed Statement of Decision." The document was signed by "Attorneys for Respondent Elizabeth Plott Tyler, *as an individual*," as well as by Tyler herself as "successor trustee In Pro Per." (Italics added.) The objections disputed the evidentiary basis for the probate court's undue influence findings by defending the fairness of the 2007 Amendment, attacking the bases for the court's conclusion that Plott was susceptible to undue influence, and defending the propriety of Tyler's conduct.

More fundamentally, under the facts established by the prior trial Tyler's conduct benefited her personally to the detriment of her duties as a trustee. A trustee is obligated to deal impartially with beneficiaries. (§ 16003.) Tyler obtained a trust amendment through undue influence that revoked the bulk of the bequest to one of the beneficiaries—her sister Key. As this court found, the evidence at the trial "supports the trial court's finding that the [2007] Amendment is nothing but [Tyler's] desire to benefit herself." (*Key v. Tyler I, supra,* B258055.) And, as discussed below, the facts established by the prior proceeding are sufficient to support a prima facie case that Tyler defended the 2007 Amendment without probable cause to do so.

28

It is the effect of Tyler's conduct that establishes whether she defended the 2007 Amendment solely in her capacity as a disinterested trustee, not the titles on the pleadings that she filed. In *Urick,* the court concluded there was prima facie evidence that the trustee/beneficiary in that case (Dana) filed a reformation petition in her capacity as a beneficiary. The court noted that the "petition was consistent with the interests of Dana as a beneficiary, not with her fiduciary duties as a trustee to the beneficiaries." (*Urick, supra,* 15 Cal.App.5th at p. 1196.) Similarly, here, Tyler's defense of the 2007 Amendment was consistent with her own interests as a beneficiary, not with her duty as a trustee to deal impartially with Key. Her pleadings defending the 2007 Amendment therefore were sufficient to trigger enforcement of the No Contest Clause.

C. ***The litigation privilege does not apply to actions to enforce no contest provisions.***

Civil Code section 47, subdivision (b) codifies a privilege that applies to a "publication or broadcast" made as part of a "judicial proceeding." (Civ. Code, § 47, subd. (b).) The principle purpose of this litigation privilege is to "afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213 (*Silberg*).)

The privilege applies to all tort actions except malicious prosecution. (*Silberg, supra,* 50 Cal.3d at p. 216.) Malicious prosecution actions are excluded because the " 'policy of encouraging free access to the courts . . . is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause,

29

and malice are satisfied.' " (*Ibid.*, quoting *Albertson v. Raboff* (1956) 46 Cal.2d 375, 382.)

Key argues that the litigation privilege does not apply to actions to enforce no contest clauses because its application would nullify the statutory scheme permitting such actions. We agree.

Our Supreme Court has held that the litigation privilege does not apply to various proceedings in which its application would make more specific statutes "significantly or wholly inoperable." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1246.) For example, the privilege does not apply to prosecutions for perjury, subornation of perjury, false report of a criminal offense, and " 'attorney solicitation through the use of "runners" or "cappers." ' " (*Ibid.*) The court has recognized these exceptions because of the " 'rule of statutory construction that particular provisions will prevail over general provisions.' " (*Ibid.*, quoting *In re James M.* (1973) 9 Cal.3d 517, 522.)

Courts of Appeal have applied the same principle in other contexts where the privilege would abrogate statutes that specifically permit particular claims. In *Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, the court held that the privilege did not apply to actions for violations of the Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et seq.). (*Komarova*, at p. 330.) The court concluded that, by prohibiting particular litigation activity in connection with debt collections, that act was more specific than the litigation privilege, and that applying the privilege would make the act "significantly inoperable." (*Id.* at pp. 339–340.)

30

In *Begier v. Strom* (1996) 46 Cal.App.4th 877 (*Begier*), the court applied a similar rationale in holding that the litigation privilege did not apply to making knowingly false police reports of child abuse. Such reports are covered by a specific statute (Pen. Code, § 11172), which imposes liability for damages caused by submitting knowingly false reports. (*Id.* at p. 884.) The court concluded that applying the litigation privilege to that conduct would "essentially nullify the Legislature's determination that liability should attach." (*Begier*, at p. 885.)

Similarly, here, applying the litigation privilege to actions to enforce no contest provisions would nullify the specific Probate Code statutes governing the enforcement of such provisions. Because section 21310 defines a "contest" as a "pleading," if the litigation privilege applied to actions to enforce no contest clauses the privilege would *always* provide a defense to conduct for which section 21311 would otherwise permit a forfeiture. In this case, the specific statutes in the Probate Code prevail over the litigation privilege to "avoid rendering a statute meaningless and ineffective." (*Begier, supra,* 46 Cal.App.4th at p. 885.)

### D. *Key provided sufficient evidence showing a probability that her petition will succeed.*

As discussed above, Tyler's pleadings defending the 2007 Amendment constituted a "direct contest" of the Trust under section 21310, subdivision (b). Under section 21311, subdivision (a), Key will prevail on her petition if Tyler brought the direct contest "without probable cause."

The parties have raised a threshold issue concerning who bears the burden of proof on the issue of probable cause under section 21311. The issue is apparently one of first impression.

31

While the issue is not dispositive on this appeal, it will arise on remand and we therefore consider it.

### i. *Key has the burden of proof to show that Tyler lacked probable cause to defend the 2007 Amendment.*

The general rule in a civil action is that a party has the burden of proof "as to each fact essential to his claim for relief." (*Estate of Della Sala* (1999) 73 Cal.App.4th 463, 470 (*Della Sala*).)  This principle is embodied in Evidence Code section 500, which provides that, "[e]xcept as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."  The Probate Code does not establish any contrary rule, and Evidence Code section 500 therefore applies to probate actions under Probate Code section 1000.  (*Della Sala,* at pp. 469–470.)

The language of section 21311 suggests that the absence of probable cause is an essential element of Key's claim.  Under section 21311, subdivision (a), a no contest clause may "*only* be enforced" against three specific categories of contests, including a "direct contest that is brought without probable cause."  (§ 21311, subd. (a)(1), italics added.)  Thus, the statute requires proof that a particular contest falls within the limited class of contests that the law makes subject to no contest clauses.

This language is inconsistent with Key's argument that probable cause is an affirmative defense because it "is an exception to enforcement of a no contest clause."  The Legislature could have used different language establishing a presumption that a direct contest is subject to a no contest clause "except for" a direct contest brought with probable cause.  It did not do so.

32

Instead, section 21311, subdivision (a)(1) makes the absence of probable cause a requirement for enforcement.

Placing the burden on the one seeking enforcement of a no contest clause is also consistent with the nature of the relief the moving party is requesting. The party attempting to enforce a no contest clause seeks forfeiture of a bequest that the decedent otherwise intended for the person who allegedly violated the clause. The "public policy to avoid a forfeiture" underlies the requirement that a no contest clause be strictly construed. (§ 21312; Commission 2007 Recommendation, *supra*, at p. 379.) A similar policy to keep the threat of forfeiture from inhibiting access to the courts underlies the probable cause requirement. (See Recommendation Relating to No Contest Clauses (Jan. 1989) 20 Cal. Law Revision Com. Rep. (1990) p. 11 ["In favor of a probable cause exception are the policy of the law to facilitate full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument, and to avoid forfeiture"].) That policy counsels in favor of placing the burden of proof on the party who is seeking the "harsh penalty" of forfeiture. (See Commission 2007 Recommendation, *supra*, at pp. 369–370.)

Evidence Code section 520 also supports assigning the burden of proof to the party who claims that a beneficiary brought a contest without probable cause to do so. Section 520 of the Evidence Code states that a "party claiming that a person is guilty of crime or wrongdoing has the burden of proof on the issue." The allegation that a person has pursued baseless litigation is an accusation of wrongdoing. (See *Western Land Office, Inc. v. Cervantes* (1985) 175 Cal.App.3d 724, 740 ["A tenant who claims his landlord acted with a retaliatory motive

33

accuses the landlord of wrongdoing" and therefore has the burden of proof on that issue under Evid. Code, § 520].)

In the similar context of malicious prosecution claims, the plaintiff has the burden to prove the defendant lacked probable cause to bring the underlying action. (*Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767, 771 ["To establish liability for the tort of malicious prosecution, a plaintiff must demonstrate, among other things, that the defendant previously caused the commencement or continuation of an action against the plaintiff that was not supported by probable cause"]; *Kassan v. Bledsoe* (1967) 252 Cal.App.2d 810, 812 ["The plaintiff in an action for malicious prosecution bears the burden of proving not only termination of the earlier proceedings in his favor, but also lack of probable cause on the part of defendants"].) Like a proceeding to enforce a no contest clause, a malicious prosecution action involves allegations of baseless litigation. And, like the probable cause element in section 21311, the requirement to prove the lack of probable cause in malicious prosecution actions exists to "avoid improperly deterring individuals from resorting to the courts for the resolution of disputes." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875.)

Key cites *Estate of Peterson* (1999) 72 Cal.App.4th 431, which contains language suggesting that, to escape a no contest provision, the "contestant" of a will must prove that he or she had probable cause to bring the contest. However, the case does not explicitly concern the allocation of the burden of proof. More important, the case was decided under the prior regulatory regime, which, as discussed above, created categories of exceptions to the general rule that no contest clauses are enforceable. The statute in place at the time provided that a "no

34

contest clause is *not enforceable* against a beneficiary to the extent the beneficiary, with probable cause, contests a provision that benefits" persons in certain defined categories, including a person who drafted or transcribed the instrument. (*Id.* at p. 434, fn. 3, italics added.) The former statute identifying persons against whom a no contest provision is *not* enforceable might be consistent with an exception to enforceability that constitutes an affirmative defense; the current statute identifying the *only* contests that are subject to a no contest provision is more consistent with an element of a claim seeking to enforce such a provision.[12]

Key also argues that the burden of proof on the probable cause element should be placed on the person who brought a contest because that person will be better able to assess the "facts known to the contestant" at the time he or she filed the contest. (§ 21311, subd. (b).) However, as Witkin notes, the "greater knowledge" factor in assigning the burden of proof "does not . . . apply with any consistency." (1 Witkin, Cal. Evidence (5th ed. 2018) Introduction, § 12.) For example, that factor does not justify placing the burden on the defendant to prove probable cause in the analogous context of malicious prosecution actions.

_____

[12] Key also cites a comment by the Commission concerning the proposed legislative changes in 2008 stating that "[p]robable cause is not a *defense* to the enforcement of a no contest clause" under subdivision (a)(2) and (3) of section 21311. (Commission 2007 Recommendation, *supra,* at p. 403, italics added.) That subdivision is not at issue here. We do not interpret the Commission's use of the word "defense" in describing the absence of an element in other provisions to be a description of the burden of proof applicable to the probable cause element in section 21311, subdivision (a)(1).

35

Nor does it apply in a probate action brought by a child omitted from a decedent's will. (See *Della Sala, supra,* 73 Cal.App.4th at p. 467 [rejecting the argument that "the burden of proof regarding 'what "the decedent had in mind" ' when executing a will that omits a living child should be borne by the estate or the beneficiary of the will, rather than by the omitted child 'who would not have been on the scene' "].)

We therefore conclude that Key has the burden of proof to show that Tyler brought her contest of the Trust without probable cause. Nevertheless, as discussed below, we also conclude that Key sufficiently met her burden to show sufficient evidence supporting her petition in opposing Tyler's anti-SLAPP motion.

> ### ii.  *The probate court's findings concerning Tyler's undue influence are sufficient evidence of a probability of success.*

Tyler had probable cause to contest the Trust by defending the 2007 Amendment if, at the time she brought the contest, she knew facts that "would cause a reasonable person to believe that there [was] a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." (§ 21311, subd. (b).) In this case, the "requested relief" was a finding that the 2007 Amendment was valid.

Key argues that the probate court's Statement of Decision granting Key's Invalidity Petition and this court's opinion affirming the probate court's decision are sufficient to support a prima facie showing that Tyler lacked probable cause to defend the 2007 Amendment. We agree.

36

Tyler argues that these decisions do not satisfy Key's burden to provide admissible evidence supporting a probability of success because the factual findings in those decisions establish only that the findings were made, not the facts themselves. Citing *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564–1566 (*Sosinsky*), Tyler asserts that a court "may take judicial notice only of the fact that the prior court made the findings in question, not of the truth of those facts."

We agree with the general legal proposition. As the court explained in *Sosinsky,* the effect of taking judicial notice of the *truth* of facts in a prior court decision would remove an issue of fact from the current dispute "without resort to concepts of collateral estoppel or res judicata that would litigate whether the issue was fully addressed and resolved." (*Sosinsky*, *supra*, 6 Cal.App.4th at p. 1564; see *Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 590 [citing *Sosinsky* in explaining that "judicial notice of findings of fact does not mean that those findings of fact are true, but, rather, only means that those findings of fact were made"].)

However, this rule does not preclude Key from relying on the probate court's prior findings as support for the merits of her No Contest Petition because collateral estoppel *does* apply here. The probate court (and this court) may properly consider the probate court's prior findings on Key's Invalidity Petition for purposes of determining the collateral estoppel effect of those findings. (Evid. Code, § 452, subd. (d); *Frommhagen v. Board of Supervisors* (1987) 197 Cal.App.3d 1292, 1299 [court may take

37

judicial notice of court records in ruling on an issue of res judicata].)[13]

_____

[13] Contrary to Tyler's argument, the Statement of Decision and this court's prior opinion are also both properly part of the record on this appeal.  Tyler herself submitted those decisions in support of her anti-SLAPP motion.  Key also filed a request for judicial notice of both decisions in support of her opposition to the anti-SLAPP motion.  Tyler objected to Key's request for judicial notice, but only on the ground that "the court may take judicial notice only of the fact that the prior court *made* the findings in question, not of the truth or falsehood of those facts."  The Statement of Decision and this court's prior opinion were before the trial court, and we therefore consider them as well.

Key also filed with this court a request for judicial notice of the entire record from the prior appeal.  Tyler opposes the request and argues that Key submitted only the Statement of Decision and this court's prior opinion in support of her opposition to the anti-SLAPP motion.  However, Tyler's own notice of motion stated that her anti-SLAPP motion was based on the "files, records and pleadings of this action."  (See *Larsen v. Johannes* (1970) 7 Cal.App.3d 491, 496 ["The notice of motion indicated reliance upon all the files in this action, and the pleadings incorporating the documentation.  This was sufficient to bring them before the court"]; *Roth v. Plikaytis* (2017) 15 Cal.App.5th 283, 291–292 [abuse of discretion for trial court to refuse to consider previously filed documents that were incorporated by reference in support of a motion for attorney fees].)  We therefore grant Key's request for judicial notice of the record from the prior appeal.  However, as discussed below, the Statement of Decision and this court's prior opinion are themselves sufficient to identify binding findings that support a prima facie case under the second step of the anti-SLAPP procedure.

38

### a. *Key has properly raised collateral estoppel on appeal*

Tyler claims that Key did not argue the collateral estoppel effect of the Statement of Decision below, pointing out that "the phrase 'collateral estoppel' is never used in her underlying brief." However, Key did claim generally that "Tyler is *estopped* from denying her exercise of undue influence or claiming that she had any good faith belief or probable cause to believe that her objections to Ms. Key's petition to invalidate the 2007 amendment had a chance of success." (Italics added.) Citing the Statement of Decision and this court's prior opinion, she also argued that "Tyler is barred by the law of the case to deny that she exercised undue influence or to claim that she had probable cause to believe that she could prevail against Ms. Key. These matters have already been established and Tyler is bound by the adverse rulings made against her."

While these references did not identify the doctrine of collateral estoppel (or issue preclusion) by name, they were certainly sufficient to apprise Tyler and the trial court of the substance of Key's argument that Tyler is bound by the results of the prior trial. Thus, there is no unfairness in considering the argument on appeal. (See *Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997 [rule that theories not raised in the trial court cannot be asserted for the first time on appeal is based on fairness to the trial court and opposing litigants]; see also *Dakins v. Board of Pension Commissioners* (1982) 134 Cal.App.3d 374, 387 [evidence of prior administrative findings that a police officer's injuries were " 'work-related' " and counsel's arguments that the pension board should therefore

39

consider the injuries as " 'service-connected' " were sufficient to raise the issue of collateral estoppel].)

Moreover, the issue that Key has raised on appeal is whether the findings in the Statement of Decision and in this court's prior opinion are sufficient to support a prima facie claim that Tyler lacked probable cause to defend the 2007 Amendment. The *contents* of those decisions are not subject to dispute. No findings of fact were necessary in the trial court for this court to determine the issues that were litigated and decided in the prior trial based on the decisions themselves. (See *Duran v. Obesity Research Institute, LLC* (2016) 1 Cal.App.5th 635, 646 ["the appellate court has discretion to consider issues raised for the first time on appeal where the relevant facts are undisputed and could not have been altered by the presentation of additional evidence"].)[14]

---

[14] Tyler also argues that Key failed to show that collateral estoppel applied because she did not inform the trial court of the specific factual findings on which she relied and failed to offer the entire trial record to establish that the findings concerned issues that were actually litigated and necessarily decided. But Key did submit the Statement of Decision itself, which is relevant extrinsic evidence of the scope of the court's prior decision. (*McClain v. Rush* (1989) 216 Cal.App.3d 18, 28, citing 7 Witkin, Cal. Procedure (3d ed. 1985) Judgments, § 256, p. 694.) In some cases—such as *Santa Clara Valley Transportation Authority v. Rea* (2006) 140 Cal.App.4th 1303, 1311–1312 (which Tyler cites)—it is necessary to review the record to determine whether an issue has been litigated and decided. But that is not so here, where the probate court issued a lengthy and detailed Statement of Decision identifying its findings and explaining their basis in the evidence.

### b. *The collateral estoppel effect of the Statement of Decision*

Collateral estoppel (also known as issue preclusion) prevents relitigation of previously decided issues. (*Samara v. Matar* (2018) 5 Cal.5th 322, 326–327 (*Samara*).) Issue preclusion applies " '(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party.' " (*Id.* at p. 327, quoting *DKN Holdings, LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) The doctrine of issue preclusion applies to final orders in proceedings under the Probate Code. (Code Civ. Proc., § 1908, subd. (a)(1); *Conservatorship of Harvey* (1970) 3 Cal.3d 646, 652; *Noggle v. Bank of America* (1999) 70 Cal.App.4th 853, 862.)

The identical issue requirement for issue preclusion addresses whether identical factual allegations are at stake, "not whether the ultimate issues or dispositions are the same." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342 (*Lucido*).) And the "necessarily decided" prong means only that " 'the issue not have been "entirely unnecessary" to the judgment in the initial proceeding.' " (*Ibid.*)

Faced with a 67-page Statement of Decision containing a detailed collection of findings and an exhaustive discussion of the evidence underlying those findings, the definition of an "issue" for purposes of issue preclusion becomes important. Because the Statement of Decision and this court's prior opinion affirming that decision were the principle items of evidence that Key proffered to show a likelihood of success on her No Contest Petition, the nature of the facts that those decisions established is important to the outcome of Key's appeal. The collateral

41

estoppel effect of those decisions is also likely to be an issue on remand. We therefore begin by explaining the methodology that we conclude is appropriate to analyze what binding "issues" those decisions determined.

Not every interpretation of every item of evidence discussed in Judge Goetz's description of her findings is necessarily binding under the doctrine of issue preclusion. Only findings on issues that are "not '. . . unnecessary' " to the court's decision are binding. (*Lucido, supra,* 51 Cal.3d at p. 342 [fact that the prosecution failed to prove indecent exposure as a basis for a probation violation was " 'necessarily decided' " even though a probation violation was established through other, admitted conduct].)

On the other hand, findings that were important to the court's decision may be binding even if they were not themselves dispositive of an ultimate legal issue. Some courts have suggested that findings are binding under the doctrine of issue preclusion only if they determine issues of "ultimate fact." (See, e.g., *California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 249 ["Under the doctrine of collateral estoppel or issue preclusion, when an issue of *ultimate fact* has been determined by a valid and final judgment, that issue cannot be relitigated between the same parties in a future lawsuit," italics added]; *Ion Equipment Corp. v. Nelson* (1980) 110 Cal.App.3d 868, 881–882; *King v. Timber Structures, Inc.* (1966) 240 Cal.App.2d 178, 183.) In some civil cases, courts have used the term "ultimate fact" while reciting the formulation of collateral estoppel as it is applied in criminal prosecutions. (See, e.g., *California Logistics*, at p. 249, citing *Ashe v. Swenson* (1970) 397 U.S. 436; *Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th

277, 286, quoting *People v. Santamaria* (1994) 8 Cal.4th 903, 912 (*Santamaria*).)[15]  Other cases have used the term to distinguish between factual findings on collateral evidentiary issues and findings that are relevant to the merits of the action.  (See *Ion Equipment,* at pp. 881–882 [prior finding concerning the admissibility of a tape recording].)

When used to characterize the importance of factual issues decided in a prior proceeding, the distinction between "ultimate" and "evidentiary" facts is unhelpful and potentially misleading. As the Restatement Second of Judgments explains:  "The line

[15] In the particular context of criminal prosecutions, the requirement that an issue concern an "ultimate fact" refers to the elements that must be proved in a second prosecution beyond a reasonable doubt.  A finding in a prior prosecution showing that the state did not meet its burden to prove an issue beyond a reasonable doubt is not binding in a subsequent prosecution if that same issue need not be proved beyond a reasonable doubt in the subsequent prosecution.  (See *Santamaria, supra,* 8 Cal.4th at pp. 921–922.)  Thus, for example, evidence that a criminal defendant committed a prior crime may be admissible even if the defendant was acquitted of that crime because the prosecution would not have to prove that the defendant committed the prior crime beyond a reasonable doubt for evidence of the prior act to be admissible in a later prosecution for a different crime.  (*Id.* at p. 921, citing *Dowling v. United States* (1990) 493 U.S. 342, 349.)  And a jury's verdict rejecting a sentencing enhancement based upon personal use of a knife does not preclude a subsequent murder prosecution based upon a theory of knife use where such knife use need not be proved for a murder conviction. (*Santamaria,* at pp. 921–922.)  As these decisions demonstrate, the concept of "ultimate fact" in this context is actually based on differences in the burden of proof rather than on some abstract measure of the degree of importance of prior factual findings.

43

between ultimate and evidentiary facts is often impossible to draw. Moreover, even if a fact is categorized as evidentiary, great effort may have been expended by both parties in seeking to persuade the adjudicator of its existence or nonexistence and it may well have been regarded as the key issue in the dispute. In these circumstances the determination of the issue should be conclusive whether or not other links in the chain had to be forged before the question of liability could be determined in the first or second action." (Rest.2d Judgments, § 27, com. j, p. 261.)

Under our Supreme Court's description of the elements of issue preclusion, the relevant distinction is not between "ultimate" and "evidentiary" facts, but between findings that are unnecessary to a decision on the merits and those that *support* that decision (i.e., are "not . . . unnecessary" to the court's decision). (*Lucido, supra,* 51 Cal.3d at p. 342; *Samara, supra,* 5 Cal.5th at p. 326.) Factual findings can support a decision on the merits of a claim even if they do not themselves resolve an element of the claim. (See *Ayala v. Dawson* (2017) 13 Cal.App.5th 1319, 1331 [prior unlawful detainer proceeding necessarily decided the issue of title even though that issue is not ordinarily germane in such a proceeding]; *Greene v. Bank of America* (2015) 236 Cal.App.4th 922, 934–935 [magistrate's credibility finding at a preliminary hearing in a prior criminal case was binding, as the magistrate's probable cause determination was based on that finding].)

With this discussion in mind, we consider the collateral estoppel effect of the probate court's order deciding Key's Invalidity Petition by identifying express findings in the Statement of Decision concerning issues that were actually

44

litigated and that support the decision. In doing so, we do not attempt to distinguish between evidentiary and "ultimate" facts.

The definition of probable cause in section 21311, subdivision (b) requires a court to consider what a "reasonable person" would believe based upon the "facts known to the contestant" at the time of filing a contest. The Statement of Decision contains a number of findings relating to the facts known to Tyler. These findings show that, at a minimum, the probate court's prior order on Key's Invalidity Petition established that:

*Tyler knew that Mrs. Plott was dependent on her for important information related to the family nursing home business.*

The probate court explained that Tyler "knew that Mrs. Plott was *dependent* on her, among others, and relied on her for information related to: [¶] 1) The business side of the business, [¶] 2) Regulatory implementation and assessment of risk management, and [¶] 3) For legal advice related to litigation as these issues pertained to the businesses."

*Tyler knew that Mrs. Plott was vulnerable to Tyler's threat to quit if Tyler did not obtain control over the family businesses after Mrs. Plott's death.*

The probate court found that Mrs. Plott was "*depending* on [Tyler] to carry on the family businesses which Mrs. Plott considered to be her legacy."

45

*Tyler controlled the communications between Mrs. Plott and her estate counsel.*

The probate court found that "Tyler acted as a gatekeeper between MSK and Mrs. Plott, controlling Mrs. Plott's communications with MSK and their access to her." The court also found that "[a]ll affirmative communications addressing dispositive terms" of the 2007 Amendment came from Tyler, Tyler's associate under her direction, or "Tyler testifying [as] to what Mrs. Plott said."

*Tyler actively participated in procuring the 2007 Amendment.*

The probate court found that Mrs. Plott did not attend *any* meetings with MSK related to the 2007 Amendment that were not also attended by Tyler or Tyler's associate.

*Although Mrs. Plott presented a strong personality, Tyler was able to overcome her will.*

The probate court based this finding in part on Tyler's conduct in "[b]ossing her mother around and losing her temper," including using her " 'scary, yelling tone.' " The court concluded that Mrs. Plott was *vulnerable in the area of her business needs and dependence on . . . Tyler's assistance with them.*" (Italics added.)

*Tyler obtained undue benefits under the 2007 Amendment.*

The probate court found that the 2007 Amendment made Tyler the beneficiary of all the contents of the Plotts' residence, which was "contrary to all dispositive terms previously expressed by Mrs. Plott." The court also found that Tyler obtained an

undue benefit from the 2007 Amendment "in that she was gifted business assets from the remainder of the Survivor's Trust in the amount of 65%," whereas the "prior testamentary plan called for the assets to be divided equally between the three daughters." And the court found that Tyler, "by manipulating how the business assets were allocated into the Survivor's Trust, ensured that the Survivor's Trust was valued in an amount that was out of proportion to the other trusts, thus increasing Ms. Tyler's interest in the overall Trust estate."

*Mrs. Plott made testamentary gifts benefiting Tyler in the 2007 Amendment that Mrs. Plott knew were not hers to give.*
The probate court found that a provision in the 2007 Amendment distributing promissory notes to Tyler and Potz had the effect of canceling those notes. As mentioned, at the time of trial, Tyler owed almost $2.5 million in principal and interest on one of those notes. The court found that Mrs. Plott "was aware that the notes were in the Marital Trust," which was irrevocable, "yet she included these in the [2007] Amendment anyway." As this court concluded, through this device Tyler "received a benefit of $1,666,666, and Key suffered a loss of $833,333." (*Key v. Tyler I, supra*, B258055.)

*Tyler's personal financial difficulties gave her the motive to unduly influence Mrs. Plott.*
The financial difficulties included her default on her $2.5 million loan, on which she had made no payments since her father's death.

*Tyler intentionally withheld relevant evidence.*

Based upon evidence of Tyler & Wilson's document retention, the documents produced by Tyler & Wilson, and the documents produced by MSK, the probate court found that Tyler "intentionally did not produce relevant evidence in an effort to prevent relevant evidence from being discovered related to determining the validity of the [2007] Amendment." (See *Key v. Tyler I, supra,* B258055 [Tyler "failed to produce e-mails to hide her involvement"].)

The probate court on remand may identify additional relevant facts established by the court's prior ruling under the issue preclusion principles discussed above. However, the findings summarized above alone are sufficient to support reversal.

A court could reasonably infer from these findings that Tyler acted *intentionally* in manipulating Mrs. Plott and in using "excessive persuasion" on her to obtain terms in the 2007 Amendment that were not the result of Mrs. Plott's free will. (Welf. & Inst. Code, § 15610.70, subd. (a); Prob. Code, § 86.) Indeed, this court previously drew such an inference from the evidence in affirming the probate court's invalidity ruling. In our prior opinion, we explained that "[i]t is reasonable to infer that Mrs. Plott allowed [Tyler] to have her way because [Tyler] threatened to quit and cause the family business to fail. Or [Tyler] made Mrs. Plott's life miserable, causing Mrs. Plott to sign the [2007] Amendment 'to keep peace'. . . . This is evidence of an overborne will that makes the transfer to [Tyler] unfair. [Tyler's] controlling and even threatening demeanor with her elderly parent, coupled with [Tyler's] personal involvement in

48

drafting the [2007] Amendment, is evidence that the unequal division of assets contemplated by the [2007] Amendment was *solely [Tyler's] plan, not Mrs. Plott's.*" (*Key v. Tyler I, supra,* B258055, italics added.)

Based on these inferences, a court could find that a reasonable person in Tyler's position would *not* have believed there was a "reasonable likelihood" that the 2007 Amendment was valid. These findings are sufficient to meet Key's burden under step two of the anti-SLAPP procedure.

We emphasize that the probate court's prior order is not sufficient in itself to establish that Tyler lacked probable cause as a matter of law. The legal standard for invalidating an instrument based upon undue influence and the standard for finding a lack of probable cause to *believe* the instrument was valid are different. (See *Jarrow, supra,* 31 Cal.4th at p. 742 [summary judgment in favor of the defense on an underlying claim does not establish lack of probable cause as a matter of law for purposes of a subsequent malicious prosecution action].)

The findings that the probate court made in issuing its prior order also do not establish the lack of probable cause as a matter of law.[16] Although the factual findings themselves are

---

[16] On the other hand, we reject Tyler's argument that the probate court's findings establish the *presence* of probable cause as a matter of law. Tyler relies on comments that the trial court made during oral arguments on the Invalidity Petition to the effect that it was a " 'very hard case' " and was " 'not a clear-cut decision.' " The probate court's oral comments were not final findings and cannot impeach the court's subsequent written ruling. (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300; *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 633.) In its final

49

binding, the probate court in the prior trial was not asked to decide the issue of probable cause and therefore did not draw any inferences specifically related to that issue. However, the established facts are sufficient to establish at least a prima facie case that Tyler lacked probable cause.[17]

## 5. Key Is Entitled to Her Legal Fees for the Prior Appeal

Key raises various theories supporting her claim for attorney fees for the prior appeal and for her argument that the probate court erred in denying her motion for those fees. We need consider only one. The plain language of Article 14 of the Trust, as interpreted above, provides for payment of her litigation expenses in resisting Tyler's contest of the Trust provisions.

We reject Tyler's claim that Key did not argue below that the Trust "is contractually obligated to pay her fees." She made precisely that argument. In her motion for attorney fees, Key

---

Statement of Decision, the court found that the "evidence is substantial and overwhelmingly establishes that the 2007 . . . Amendment is the product of undue influence." The court also stated its conclusion that the evidence of undue influence would be sufficient under a "clear and convincing evidence" standard. In ruling on Tyler's anti-SLAPP motion, the probate court erred in taking judicial notice of the prior judge's oral comments without considering whether they contradicted the court's final, written decision.

[17] Because the preclusive effect of the probate court's order on Key's Invalidity Petition is sufficient to meet her burden under step two of the anti-SLAPP procedure, we need not consider the admissibility or probative value of the Statement of Decision apart from its relevance to the issues that were previously litigated and decided.

pointed out that a "trust agreement is a contract," and she identified the same language in Article 14 that she cites on appeal as the basis for a fee award. She then argued that she was entitled to her attorney fees under Civil Code section 1717 because she had "prevailed in this action on the contract." Although in the probate court she cited the reciprocal attorney fee portion of Civil Code section 1717 as authorization for a fee award, that section also provides general authority for the enforcement of an attorney fee provision in a contract. Her argument below was sufficient to raise the issue for the probate court's consideration.[18]

In any event, as discussed below, Key's argument raises a legal issue concerning the interpretation of a trust instrument that does not depend upon any disputed facts. We may consider that argument for the first time on appeal. (*Blech v. Blech* (2018) 25 Cal.App.5th 989, 1000, fn. 31 (*Blech*).)

"A declaration of trust constitutes a contract between the trustor and the trustee for the benefit of a third party. . . . The mutual consent of the parties to the express declaration of trust constitutes a contract between them, each having rights and obligations which may be enforced by the other and by the beneficiary designated in the contract." (*Estate of Bodger* (1955) 130 Cal.App.2d 416, 424–425.) Absent disputed extrinsic evidence, the interpretation of a trust instrument is an issue of law that we consider independently. (*Blech, supra,* 25

---

[18] We also reject Tyler's argument that Key's attorney fees motion was untimely. She made that argument below and the trial court implicitly rejected it by considering the motion on the merits. Tyler does not identify any abuse of discretion in that decision and we therefore will not reconsider it on appeal.

Cal.App.5th at pp. 1001–1002.) The parties do not identify any relevant extrinsic evidence here, and we therefore consider the interpretation of the Trust de novo.

As mentioned, Article 14 contains the Trust's no contest provision. After setting forth the terms of that provision, the article states that "[e]xpenses to resist any contest or attack [of] any nature upon any provision of this Trust shall be paid from the Trust Estate as expenses of administration." As discussed above, Tyler's defense of the 2007 Amendment amounted to a contest of the Trust provisions in her capacity as a beneficiary. Given the placement of this language at the conclusion of the Trust's No Contest Clause, it is clear that "expenses" in that context encompass litigation expenses, including attorney fees. Key incurred litigation expenses, including attorney fees on appeal, in "resist[ing]" Tyler's attack on the Trust.

The language in Article 14 authorizing the payment of expenses in resisting a contest is not limited to expenses of the trustee. As Key points out, reimbursement of a trustee's litigation expenses are addressed in a different provision of the Trust. We interpret the Trust's provisions as a whole and seek to avoid an interpretation that would make any provision surplusage. (See § 21121; *Blech, supra,* 25 Cal.App.5th at p. 1001; *Estate of Lindner* (1978) 85 Cal.App.3d 219, 225.) Article 14 therefore authorizes reimbursement of Key's attorney fees in defending Tyler's contest, and the trial court erred in denying Key's motion.

On remand, the probate court shall consider the reasonable amount of fees to award to Key under Article 14 for her defense of the prior appeal. Pursuant to that article, the fees are to be awarded "from the Trust Estate as expenses of administration."

52

However, the trial court has discretion under principles of equity to direct that the beneficiary responsible for the expenses of the litigation be solely responsible for their reimbursement. (*Estate of Ivy* (1994) 22 Cal.App.4th 873, 883 [" 'Where the expense of litigation is caused by the unsuccessful attempt of one of the beneficiaries to obtain a greater share of the trust property, the expense may properly be chargeable to that beneficiary's share' "], quoting Fratcher, Scott on Trusts (4th ed. 1988) § 188.4, p. 69, fn. omitted.) On remand the trial court should therefore consider whether Key's attorney fees should be paid only from Tyler's portion of the Trust estate (if any).[19]

---

[19] Tyler claims that any enforcement of the No Contest Clause should be against her portion of the survivor's trust only. We decline to decide that issue, which relates to the scope of permissible relief under Key's No Contest Petition rather than the probate court's decision granting Tyler's anti-SLAPP motion that is the subject of this appeal.

**DISPOSITION**

The probate court's orders (1) striking Key's No Contest Petition under Code of Civil Procedure section 425.16 and (2) denying Key's motion for attorney fees on appeal are reversed. The case is remanded for further proceedings on Key's petition and for determination of Key's reasonable attorney fees in defending Tyler's appeal in case No. B258055. On remand, the trial court shall determine whether those fees are to be paid solely from Tyler's share of the Trust estate (if any). Key is entitled to her costs on this appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.


54