Filed 4/14/26  Piazzi v. Laffey CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DIANE E. PIAZZI,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GERALD J. LAFFEY,<br><br>Defendant and Respondent. | B342738<br><br>(Los Angeles County<br>Super. Ct. No. BP157757) |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Juárez, Judge.  Affirmed.

Nelle S. Paegel, for Plaintiff and Appellant.

Keith S. Walker and Law Offices of Keith S. Walker, for Defendant and Respondent.

Appellant Diane Piazzi was the primary beneficiary of a trust initially settled in 1991 by her late mother, Evelyn Piazzi. Diane[1] petitioned to invalidate several amendments Evelyn made to the trust between 2002 and 2007, alleging Evelyn lacked capacity to amend the trust and was unduly influenced by respondent Gerald Laffey and other relatives. The probate court denied the operative fourth amended petition (FAP) after trial, and we affirmed in *Piazzi v. Laffey* (May 10, 2023, B305695) [nonpub. opn.] (*Piazzi*).

Gerald then filed a petition to terminate the trust, alleging the FAP violated the no contest clause contained in the 2002 trust amendment. After briefing and a hearing, the probate court granted the petition to terminate. It found that the FAP was a direct contest of a protected instrument, and Diane lacked probable cause when she filed it.

Diane disputes these findings on appeal. She further argues that the probate court was prejudiced against her, and its denial of her FAP "requires a re-examination." We reject her contentions and affirm.

## BACKGROUND

### I.    Trust and Trust Amendments

As we summarized in *Piazzi*, *supra*, "Due to disabilities, Diane receives means-tested public benefits. In June 1991, Diane's mother Evelyn created the Revocable Living Trust of Evelyn C. Piazzi. Through special needs trust provisions, the trust expressed Evelyn's intent that after her death, the trust estate would be used to supplement Diane's means-tested benefits without disqualifying her from continuing to receive

---

[1]    We refer to the parties by their first names for clarity and in accordance with their convention.

2

them. In March 1999, Evelyn executed a first amendment to the trust, which deleted the special needs trust provisions and provided for the estate to be distributed directly to Diane after Evelyn's death."

"In November 2002, Evelyn executed the second trust amendment, the heart of the parties' dispute. In lieu of a direct distribution to Diane, the amendment reinstated provisions to supplement and safeguard Diane's receipt of public benefits after Evelyn's death. It gave the successor trustee discretion to terminate the trust if the trust's existence or any related change in law would otherwise disqualify Diane from receiving any public benefits. The amendment designated respondent Gerald and his mother (Evelyn's nephew and sister, respectively) as successor trustees." (*Piazzi, supra.*)

Like the original trust and first amendment thereto, the second trust amendment included a no contest clause. It stated: "If any beneficiary under this instrument, singularly or in combination with any other person or persons, directly or indirectly contests this instrument, any amendment to this instrument, or the will of the settlor in whole or in part, or opposes, objects to, or seeks to invalidate any of the provisions of this instrument or the will of the settlor, or the validity of any contract, agreement (including trust agreement), declaration of trust, beneficiary designation, or other document executed by the settlor or executed by another for the benefit of the settlor that is part of the settlor's integrated estate plan, or seeks to succeed to any part of the estate of the settlor other than in the manner specified in this instrument or in the will of the settlor, then the right of that person to take any interest given to him or her by

3

this instrument or any amendment to this instrument shall be void, and any gift or other interest in the trust property to which the beneficiary would otherwise have been entitled shall pass as if he or she had predeceased the settlor without issue. Settlor specifically exempts petitions under California Probate Code Sections 850 et seq. from the effect of this clause."

"Between June 2004 and September 2007, Evelyn executed three further trust amendments, adding one of Gerald's sisters (Evelyn's niece) as a third successor trustee," after Gerald and his mother. (*Piazzi*, *supra*.) These amendments also modified the trust provision governing distribution of assets after Diane's death. They otherwise "confirm[ed] and ratifie[d] the terms of the trust as stated" in the second trust amendment, but did not expressly refer to the no contest clause.

## II.    Diane's Petition to Invalidate the Trust Amendments

"Evelyn died in September 2014. In November 2014, Diane petitioned the probate court to invalidate the 2002 amendment and each subsequent amendment (collectively, the Trust Amendments). In May 2016, Diane filed her operative fourth amended petition, naming Gerald, his mother, and two of his sisters as defendants." (*Piazzi*, *supra*.)

The FAP is not included in the appellate record before this court. However, it is undisputed that "In Diane's first cause of action, she sought declaratory relief to invalidate the Trust Amendments on the grounds that: (1) the Trust Amendments were inconsistent with Evelyn's intent to provide for Diane after her death; (2) Evelyn lacked capacity to execute the Trust Amendments at the time she signed them; and (3) the Trust Amendments were the product of undue influence asserted on Evelyn by Gerald and his relatives." (*Piazzi*, *supra*.)

4

The FAP proceeded to trial in July 2019.  During her opening statement, Diane's counsel summarized the evidence and asserted that the Trust Amendments "need to be invalidated." Diane then presented her case-in-chief, introducing testimonial and documentary evidence through a number of witnesses, including herself and Gerald.  "At the end of Diane's case-in-chief, Gerald's counsel moved for judgment under Code of Civil Procedure section 631.8." (*Piazzi*, *supra*.)  The trial court granted the motion on the ground that Diane failed to satisfy her burden of proof on all her claims.  It found, "There was no evidence that Settlor did not intend to amend the Trust as she did in 2002, 2004, 2006, or 2007.  What evidence there was supported the fact that Settlor intended to make all the amendments to the Trust that were at issue in this proceeding.  There was no evidence that Settlor did not have the capacity to amend the Trust. . . .  There was no evidence that anyone unduly influenced Settlor to amend the Trust. . . .  Petitioner's case-in-chief failed to establish any of her claims by a preponderance of the evidence."  The trial court denied Diane's October 2019 motion for reconsideration, and on February 11, 2020 "issued a final order granting Gerald's motion for judgment and denying Diane's fourth amended petition." (*Piazzi*, *supra*.)

Diane appealed. We affirmed in *Piazzi*.  We concluded that "as to all three of Diane's bases for challenging the Trust Amendments—lack of capacity, undue influence, and intent— substantial evidence supports the probate court's findings that Diane did not prove her claims." (*Piazzi, supra*.)  The Supreme Court denied review.  (See S280556.)

5

## III. Gerald's Petition to Terminate

In November 2019, Gerald filed a petition to terminate the trust due to violation of the no contest clause. Gerald argued that Diane's FAP was a contest within the meaning of Probate Code section 21310, subdivision (c),[2] because it sought to invalidate the second trust amendment. He further argued that the second trust amendment was a "protected instrument" as defined by section 21310, subdivision (e)(1), and Diane contested it without "probable cause," defined in section 21311, subdivision (b) as a reasonable belief that there was a reasonable likelihood her requested relief would be granted after an opportunity for further investigation or discovery. Gerald asserted that Diane lacked probable cause both when she filed the initial petition and when she filed the operative FAP. He contended that "Diane's utter inability to establish even a *prima facie* case when her contest finally went to trial in its fifth year, [demonstrated] that she knew of no facts that would cause a reasonable person to believe in the likelihood of her eventually prevailing at trial. She certainly did not allege any such facts in any of the five iterations of her petition, the first four having failed to withstand [Gerald's] demurrers."

After the appeal in *Piazzi* was resolved and proceedings below resumed, the court ordered simultaneous briefing on Gerald's petition. The initial briefs were filed on May 3, 2024. In Gerald's brief, he reiterated his contention that Diane's FAP was a direct contest of the second trust amendment because it alleged the instrument was signed under incapacity and undue influence. He further asserted that the FAP was filed "nearly eighteen

---

[2]     All further undesignated section references are to the Probate Code.

months after Piazzi's initial petition, giving her more than enough time to investigate the facts and to conduct discovery" for purposes of establishing probable cause. He contended that her "allegations, and the evidence she adduced at trial, demonstrate that she had no reasonable likelihood of prevailing on the issues of lack of capacity and undue influence."

In Diane's opposition, she argued that the no contest clause in the second trust amendment was "void" because the three subsequent amendments did not incorporate it. She further argued that she had probable cause when she filed the initial petition in 2014 and "[e]ach and every iteration" thereafter, Gerald had the burden to prove otherwise, and he could not rely on the result of the 2019 trial to do so. Diane also asserted that public policy disfavors enforcement of no contest clauses, and characterized her petition as an effort to ensure the proper interpretation of Evelyn's estate plan.

The parties filed simultaneous response briefs on May 31, 2024. Gerald argued that the FAP was the first to make "an express allegation" of undue influence and incapacity sufficient to survive demurrer. He nevertheless contended that Diane "never had a reasonable belief that she would be likely to prevail on any of the grounds." Gerald asserted that evidence at trial showed that Diane "lived her entire life with her mother, whose financial adviser testified to [Evelyn's] ability to understand financial matters years after the last challenged amendments had been executed. She never considered seeking the appointment of a conservator for her mother. Her claim that her mother lacked testamentary capacity as early as 2002 was utterly without merit, and any reasonable person would have understood that. Similarly, her claims that her mother was somehow unduly

7

influenced by relatives in a distant state to make each of the four challenged documents was also nonsense, especially in light of Piazzi's testimony that she accompanied her mother when she went to discuss her trust with her attorney."

Diane styled her May 31, 2024 brief as objections to Gerald's initial brief. She contended that Gerald and his counsel committed "material misconduct" and "fraud" by misstating facts and the law in the May 3 brief. She claimed the brief "fraudulently twists, omits, jumbles statutory language in an attempt to deceive the Court into becoming non-compliant with public policy." Diane further contended that the trial court's statement of decision after trial on her petition was "silent" as to the "validity" of the second trust amendment; that Gerald "must disprove Diane's allegations, facts, discovery, testimonies (including his own), and evidence Diane has laboriously presented to the Court since 2014" to show she lacked probable cause; and that "none of her assertions and/or claims have been refuted by a reasonable person." Diane claimed she had probable cause "because she is a reasonable person, asserted disinheriting facts in good faith and added many more later."

Gerald filed a reply brief on June 21, 2024. He declined to "comment on the *ad hominem* attack," and disputed Diane's substantive contentions. He also reiterated his arguments, including those regarding the lack of probable cause. In Diane's final brief, which disparaged Gerald's briefing as a "screed of opinions that are inaccurate to say the least," she maintained that her petition was not a contest and that the no contest clause was inapplicable. Diane also argued that probable cause is subject to a lower standard than preponderance of the evidence, and the evidence she presented at trial "proved that she had a

reasonable likelihood of success had it been viewed from the standpoint of a 'reasonable person.'" She asserted that as long as her counsel reasonably believed her position was correct, the no contest clause could not be enforced against her.

After hearing argument on July 17, 2024, the probate court issued a written ruling granting Gerald's petition on September 3, 2024. The court found that Diane's FAP was a "direct contest" within the meaning of section 21310, subdivision (b) because it alleged the Trust Amendments were invalid due to incapacity and undue influence, and the challenged second trust amendment was a "protected instrument" because it contained an unambiguous no contest clause.

As to probable cause, the court cited the definition in section 21311, subdivision (b) and observed that Diane "is correct in arguing that probable cause is distinct from ultimate success" of a petition at trial. The court agreed with Gerald, however, that the key inquiry was not whether Diane "had subjective beliefs about the settlor's intention to maximize her beneficial interest in the trust," but whether she had a "reasonable belief that the settlor lacked capacity at the time the instruments were executed," or "a reasonable belief that the execution of the trust was improper." The court found that Diane was "unable to explain what facts would have supported a reasonable belief that the settlor lacked capacity or that the execution of the trust was improper at the time the fourth amended petition was filed. The evidence is wholly lacking. As such, the court finds [Diane] lacked probable cause to file the fourth amended petition." It accordingly granted the petition and overruled "the objections thereto."

9

Diane subsequently filed a peremptory challenge to the probate court pursuant to Code of Civil Procedure section 170.6, which the court denied as untimely.  She also filed objections to the court's ruling, asserting the court made "numerous statements that are wholly inapposite to the prevailing rules of law, both statutory and precedential common law."

On October 10, 2024, the probate court filed an order terminating the trust and directing distribution of the trust assets to remainder beneficiaries.  Diane timely filed a notice of appeal on November 25, 2024.

## DISCUSSION

### I. Scope of Appeal

Throughout her briefing, Diane criticizes the probate court's ruling denying the FAP, asserting that it "omits" certain information, "includes many wrong conclusions," and "requires a re-examination . . . within the parameters of this Appeal."  These assertions are not well-taken. Diane's FAP has been fully and finally adjudicated.  This appeal concerns only Gerald's petition to terminate the trust.  We will not revisit any rulings we made in *Piazzi, supra*. Nor will we address the contentions raised for the first time on appeal that Gerald should forfeit both his trusteeship and his interest in the trust.  (See *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11.)

### II. No Contest Clause

Diane contends the probate court erred in concluding that her FAP violated the no contest clause in the second trust amendment. She argues that neither her initial petition nor the FAP was a "direct contest," that the second trust amendment is not a "protected instrument," and that the probate court applied

10

incorrect legal standards to conclude that she acted without
"probable cause." We disagree.

### A. Governing Principles

A "no contest clause in a trust instrument 'essentially acts
as a disinheritance device, i.e., if a beneficiary contests or seeks
to impair or invalidate the trust instrument or its provisions, the
beneficiary will be disinherited and thus may not take the gift or
devise provided under the instrument.'" (*Donkin v. Donkin*
(2013) 58 Cal.4th 412, 422 (*Donkin*).)  No contest clauses "have
long been held valid in California" because they "promote the
public policies of honoring the intent of the donor and
discouraging litigation by persons whose expectations are
frustrated by the donative scheme of the instrument." (*Ibid.*)
However, because they may negatively affect countervailing
public policies "of avoiding forfeitures and promoting full access
of the courts to all relevant information concerning the validity
and effect of a will, trust, or other instrument," no contest clauses
are strictly construed.  (*Ibid.*)  The current statutory framework
applicable to no contest clauses in instruments that became
irrevocable on or after January 1, 2001 limits "enforceability of
the no contest clause to (1) direct contests brought without
probable cause; (2) challenges to the transferor's ownership of
property at the time of the transfer, if expressly included in the
no contest clause; and (3) creditor's claims and actions based on
them, if expressly included in the no contest clause."  (*Id.* at p.
426, citing §§ 21311, subd. (a)(1)-(3), 21315.)  The first scenario
described is the relevant one here.

The Probate Code defines a "contest" as "a pleading filed
with the court by a beneficiary that would result in a penalty
under a no contest clause, if the no contest clause is enforced."

11

(§ 21310, subd. (a).)  A "direct contest" is "a contest that alleges the invalidity of a protected instrument or one or more of its terms" based on enumerated grounds including forgery, undue influence, and lack of capacity.  (§ 21310, subd. (b).)  A "protected instrument" is one that "contains the no contest clause" or "is in existence on the date that the instrument containing the no contest clause is executed and is expressly identified in the no contest clause, either individually or as part of an identifiable class of instruments, as being governed by the no contest clause."  (§ 21310, subd. (e).)  As noted above, "probable cause exists if, at the time of filing of a contest, the facts known to the contestant would cause a reasonable person to believe there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery."  (§ 21311, subd. (b).)

The party seeking enforcement of a no contest clause bears the burden of proof that it is applicable.  (See *Key v. Tyler* (2019) 34 Cal.App.5th 505, 529-531 (*Key II*).)  "In the absence of disputed facts, we review a court's application of a no contest clause de novo."  (*Meiri v. Shamtoubi* (2022) 81 Cal.App.5th 606, 614; see also *Key v. Tyler* (2024) 102 Cal.App.5th 365, 373 (*Key III*) ["interpretation of a trust instrument is an issue of law unless there is a conflict in extrinsic evidence"].)  We presume the probate court's order was correct; as the appellant, Diane bears the burden of demonstrating reversible error.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

**B.    The Second Trust Amendment is a Protected Instrument**

Diane contends that there can be no violation of the no contest clause here because the Trust Amendments are not

protected instruments.  She acknowledges that the second trust amendment contains a no contest clause, but argues that it is void and unenforceable because the subsequent trust amendments made between 2004 and 2007 do not include or refer to it.  We disagree.

An instrument that contains a no contest clause is a protected instrument.  (§ 21310, subd. (a).)  The second trust amendment unambiguously contains a no contest clause and therefore is a protected instrument.  Diane contends that it "literally *evaporates* as a result of its being followed by three more amendments, each of which fails to refer to a no-contest clause."  The primary authority on which she relies, *Aviles v. Swearingen* (2017) 16 Cal.App.5th 485 (*Aviles*) does not support this proposition.  In *Aviles*, petitioner Aviles was the trust settlor's boyfriend.  The second amended version of the trust provided that Aviles would receive the settlor's real property and the remaining trust assets would be divided among her family and godchildren.  The second amended trust also included a no contest clause.  The third amended trust, which the settlor executed at the behest of her caregiver without the advice of counsel, named the caregiver the sole remainder beneficiary and successor trustee.  It "incorporated by reference the unchanged provisions of the second amendment," but did not specifically refer to the no contest clause.  (*Aviles*, *supra*, 16 Cal.App.5th at pp. 488-489.)

After the settlor died, Aviles filed a petition to invalidate the third amended trust on the ground that it was the product of undue influence and financial abuse.  (*Aviles*, *supra*, 16 Cal.App.5th at p. 489.)  The caregiver opposed the petition and "filed a counterpetition to disinherit Aviles alleging that he

13

violated the no contest clause in the second amendment by challenging the Third Amendment." (*Ibid.*) The probate court ruled that the challenged third amendment was not a protected instrument because it did not contain a no contest clause or "expressly reference" the no contest clause in the second amendment. (*Id.* at p. 490.) The caregiver appealed, and the appellate court affirmed. It found that the third amendment did not contain its own no contest clause, and held that it could not incorporate the no contest clause from the second amendment without specifically mentioning it. (*Id.* at p. 491.) The appellate court explained that no contest clauses are strictly construed, and cannot apply to "future trust amendments . . . unless the amendment specifically refers to the no contest clause." (*Ibid.*) The court observed that without an explicit reference, it could not conclude that the settlor "unequivocally expressed her intent to apply the no contest clause to petitions contesting trust amendments that are the product of fraud or undue influence." (*Id.* at p. 492.)

*Aviles* stands for the proposition that a trust amendment cannot incorporate a no contest clause from a previous instrument through general incorporation language; it must expressly do so. *Aviles* does not stand for the proposition that a no contest clause in the previous version of the trust "evaporates" or becomes void; it holds that future amendments do not automatically incorporate it. *Aviles* accordingly is relevant only to the extent that it precludes the later amendments in this case, those executed between 2004 and 2007, from being protected instruments. Gerald concedes those instruments are not protected instruments in any event. Nothing in *Aviles*

14

undermines the validity of the no contest clause contained in the second trust amendment.  It is a protected instrument.

### C.     The FAP is a Direct Contest of a Protected Instrument

Diane contends that the initial petition she filed in November 2014 is the relevant petition here and was not a direct contest. She alternatively contends that the FAP likewise was a petition to reform the second trust amendment and therefore also was not a direct contest.  We conclude that the FAP is the pertinent petition, and the probate court correctly concluded the FAP was a direct contest.

Gerald's petition to terminate alleged that the FAP violated the no contest clause in the second trust amendment.  Gerald never sought to apply the no contest clause to Diane's initial petition, which was superseded by several intermediate petitions.  The FAP was the operative petition that went to trial.  There is no basis from which to conclude Diane's initial, long-inoperative petition is the relevant one for purposes of these proceedings.

The FAP, in both form and substance, plainly meets the definition of "direct contest": it alleges the second trust amendment is invalid on several of the bases listed in section 21310, subdivision (b).  The caption of the FAP requests a "court declaration to invalidate 2002 Amendment and Restatement of Trust and 2004, 2006, and 2007 Amendments Thereto based upon: intent, incapacity and undue influence. . . ."  During trial, Diane's counsel asserted that the Trust Amendments "need to be invalidated," and called witnesses who testified about the creation and alleged forgery of the second trust amendment.  (See *Piazzi*, *supra*.)  In the previous appeal, Diane argued that she demonstrated that Evelyn lacked capacity and was unduly

15

influenced.  (See *Piazzi*, *supra*.)  The only rational conclusion on this record is that the FAP sought to invalidate the protected second trust amendment on grounds listed in section 21310, subdivision (b) and therefore is a direct contest within the meaning of that statute.

Diane nevertheless contends that the FAP was a petition to reform the trust to comport with Evelyn's intent.  She attempts to analogize the case to *Packard v. Packard* (2025) 108 Cal.App.5th 1284 (*Packard*), but *Packard* is distinguishable.  In *Packard*, the settlor created a trust dividing his estate equally between his two sons, Greg and Scott, upon his death.  (*Packard*, *supra*, 108 Cal.App.5th at p. 1288.)  The settlor subsequently amended the trust to state that Greg would receive the settlor's residence, while Scott would receive a monetary sum equal to the value of the residence.  (*Ibid*.)  Two years later, the settlor amended the trust by handwriting the word "one-half," altering the relevant provision to suggest that Scott would receive a sum equal to only one-half the value of the residence.  (*Id*. at p. 1289.)  After the settlor died, Scott filed a petition "asking the probate court to construe and reform the first amendment so that it accurately reflected what he alleged to be [the settlor's] intent, namely, "to ensure that Greg and Scott received equal distributions from the trust."  (*Ibid*.)  Greg opposed the petition, arguing that it was a contest that was not timely filed.  (*Ibid*.)  The probate court agreed with Greg, but the appellate court reversed.  It concluded that Scott's petition "is one for reformation of the trust to conform to the trustor's true intent, and he may prove it through use of extrinsic evidence."  (*Id*. at p. 1294.)  The court explained, "Scott does not seek to nullify his father's trust.  He does not question the *validity* of the amendment by contending, for example, that

16

[the settlor] did not have the capacity to make the amendment and it was therefore void. [Citation.] Rather, he argues that [the settlor] always intended his assets to be divided equally between his two children, and the handwritten 'one-half' interlineation reflects his mistaken belief that he was accomplishing his goal." (*Id*. at p. 1293.)

Here, as discussed above, Diane's FAP specifically did what Packard's did not: it questioned the validity of the second trust amendment by contending Evelyn did not have the capacity to amend the trust and was unduly influenced to do so. These are the hallmarks of a direct contest, not a request to reform the document. *Packard* is not applicable.

### D. Diane Lacked Probable Cause

The probate court found there were no facts demonstrating a reasonable belief on Diane's part that Evelyn lacked capacity or was unduly influenced in 2002, when she executed the second trust amendment. Diane contends the probate court erroneously placed the burden of proof on her, applied the wrong legal standard, and disregarded her evidence of Evelyn's intent. We find no error.

Diane argues that the probate court improperly relied on the fact that it entered judgment against her on the FAP to conclude that she lacked probable cause when she filed the FAP. The probate court recognized, however, that Diane "is correct in arguing that probable cause is distinct from ultimate success." As explained in *Key II*, "[t]he legal standard for invalidating an instrument based upon undue influence and the standard for finding a lack of probable cause to *believe* the instrument was [in]valid are different." (*Key II, supra*, 34 Cal.App.5th at p. 539.) "[E]very case litigated to a conclusion has a losing party, but that

17

does not mean the losing position was not arguably meritorious when it was pled" and "does not establish that the suit was brought without probable cause." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 743.) A claim that is tenable when filed may nevertheless fail "for reasons having to do with the sufficiency of the evidence actually adduced as the litigation unfolds." (*Id.* at pp. 742-743.) For these reasons, a defendant who prevails at trial does not automatically establish that the suit was brought without probable cause. (*Id.* p. 743.)

This does not mean, as Diane suggests, that the evidence adduced during trial and the probate court's findings after trial are irrelevant. "The definition of probable cause in section 21311, subdivision (b) requires a court to consider what a 'reasonable person' would believe based upon the 'facts known to the contestant' at the time of filing a contest." (*Key II*, *supra*, 34 Cal.App.5th at p. 536.) Evidence bearing on this inquiry may be adduced at trial, and the probate court may make express findings on issues actually litigated that support its decision. (See *ibid.*) Unlike the probate court in *Key II*, the probate court here was "asked to decide the issue of probable cause" and properly drew "inferences specifically related to that issue." (*Id.* at p. 539.)

The probate court found that Diane failed to introduce any evidence at trial that Evelyn "did not intend to amend the Trust as she did in 2002, 2004, 2006, or 2007. What evidence there was supported the fact that Settlor intended to make all amendments to the Trust that were at issue in this proceeding. There was no evidence that Settlor did not have the capacity to amend the Trust." The court cited testimony from both Evelyn's attorney who drafted the trust documents and her financial advisor that

18

Evelyn had capacity and understood her actions. The court found no evidence, even from Diane's testimony, that Evelyn was unduly influenced.[3] The forensic document examiner who testified that various pages of the trust had been copied multiple times "could not say what substantive text portions, if any, of the Trust had been altered in any way that modified the substance of the Trust." The probate court found Diane's evidence so insufficient that it granted Gerald's request for judgment under Code of Civil Procedure section 631.8. The probate court relied on this "wholly lacking" evidence to conclude Diane lacked probable cause when she filed the FAP.

Diane argues that we "should conclude that her evidence presented at trial clearly shows that she had probable cause in 2014 [*sic*], at the time of filing [her initial petition]." She contends her evidence shows that Evelyn intended to provide for her in the trust, and "Gerald's termination petition fails to contradict Diane's evidence of Evelyn's intent."[4]

The problem is that Evelyn's intent to provide for Diane was not what Diane needed to prove at trial. Diane alleged in her FAP that the second trust amendment was invalid because Evelyn lacked capacity and/or was unduly influenced. To have probable cause when she filed the FAP, Diane had to have a

___

[3] Diane testified at trial that she was "always present" at all of Evelyn's appointments, including when Evelyn met with her attorney. The attorney corroborated this testimony and specifically testified that Diane was present at the 2002 meeting at which the second trust amendment was prepared.
[4] She also asserts that her evidence was "neither *disputed* nor *impeached*," because Gerald moved for judgment under Code of Civil Procedure section 631.8 rather than presenting a case-in-chief.

19

reasonable belief that there was a reasonable likelihood the court would invalidate the second trust amendment for one of those reasons. (See § 21311, subd. (b).) None of the evidence adduced at trial and summarized in the briefing here lends support to that conclusion. Even if we credit Diane's claims that Gerald and other relatives took advantage of Evelyn on her deathbed in 2014, which are not properly supported by citation to the record, that does not give rise to an inference that Diane reasonably believed they did so 12 years earlier, when Evelyn executed the second trust amendment in Diane's presence.

On the record in this case, no reasonable person could have believed, at any point, that Evelyn lacked capacity or was unduly influenced in 2002. Indeed, as the probate court observed, Diane "is unable to explain what facts would have supported a reasonable belief that the settlor lacked capacity or that the execution of the trust was improper at the time the fourth amended petition was filed." While Gerald had the burden of proof below, Diane bears the burden of showing error here. She has not done so.

## III. Alleged Judicial Bias

Diane contends the probate court was biased or prejudiced against her. She contends the court evinced "extreme personal prejudice" against her by dismissing or disregarding the evidence of Evelyn's intent that she presented at the FAP trial and "misplac[ing] the burden of proof . . . on Diane's shoulders." In her exhaustive recitation of the evidence presented during the FAP trial, she characterizes various evidentiary rulings, remarks, and other occurrences as "proof of judicial prejudice against Diane" or "for Respondent" and his counsel. She further asserts "there must be a personal reason" that the court

20

overruled her demurrer and denied her motion to strike Gerald's petition to terminate, because "[o]therwise, the probate court would surely have followed basic procedure and applied law." Diane also suggests that the court "used Gerald's termination petition as a means by which to eliminate eight other petitions from its docket that are mooted" by its ruling, and "[*d*]*efiantly*" (italics in original) "chose to repeat" an error for which it was previously reversed in a different case.[5]

"'Bias or prejudice consists of a "mental attitude or disposition of the judge towards [or against] a party to the litigation. . . ."'" (*Roitz v. Coldwell Banker Residential Brokerage Co.* (1998) 62 Cal.App.4th 716, 724, alterations in original.) "When reviewing a charge of bias, ' . . . the litigants' necessarily partisan views should not provide the applicable frame of reference. [Citations.]'" (*Ibid.*) "Potential bias must be clearly established." (*Ibid.*) We presume the honesty and integrity of the trial court. (*People v. Chatman* (2006) 38 Cal.4th 344, 364.)

When a party challenges judicial bias only at the conclusion of the proceedings, the "only avenue for their bias argument is the due process clause, which sets an exceptionally high standard." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.) "Mere expressions of opinion, based on observation of witnesses and evidence, do not demonstrate judicial bias," nor do "continuous rulings against a party." (*Ibid.*) This court's role is

---

[5]      That previous case was *Key v. Tyler*. (See *Key II, supra,* 34 Cal.App.5th 505; *Key III, supra,* 102 Cal.App.5th 365.) The probate court that presided over the instant case only presided over *Key III*, and as of that ruling had "not yet considered whether the facts show that Tyler lacked probable cause." (*Key III, supra,* 102 Cal.App.5th at p. 381.)

limited to determining whether the trial court's behavior was so prejudicial that it denied an appellant a fair trial. (*People v. Snow* (2003) 30 Cal.4th 43, 78.) "It is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation." (*Schmidt v. Superior Court*, *supra*, 44 Cal.App.5th at p. 589.)

That high standard is not satisfied in this case. Nothing in the record supports Diane's claims of judicial bias. We previously found no error in the probate court's ruling on Diane's FAP, and we currently find no error in its ruling on Gerald's petition to terminate. Even if we had, "the leap from erroneous rulings to the appearance of bias is one we decline to make." (*Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 60.) "The mere fact that the trial court issued rulings adverse to [Diane] on several matters in this case, even assuming one or more of those rulings were erroneous, does not indicate an appearance of bias, much less demonstrate actual bias." (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 674; see also G*arcia v. Estate of Norton* (1986) 183 Cal.App.3d 413, 423 ["Errors of law standing alone do not constitute bias or prejudice for purposes of disqualification of a trial judge."].)

## IV.    Civility

"Having resolved the merits of the appeal, we cannot allow the tone of the briefing to pass without comment." (*WasteXperts, Inc. v. Arakelian Enterprises, Inc.* (2024) 103 Cal.App.5th 652, 666.) Diane's appellate briefing is replete with unsupported allegations impugning Gerald, including claims that he and his relatives "invaded" and looted Diane and Evelyn's home while Evelyn "lay dying," sought to "throw Diane into the streets," forged his mother's signature to install himself as trustee, and

allegedly told the probate court that Diane did not "deserve[ ] to live where she lives," or "deserve[ ] to live," period. As alluded to *infra*, Diane's briefing below took a similar tone.

Ad hominem attacks on the opposing party or opposing counsel have no place in appellate briefing. (See *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 32-33 ["[A]n opening brief is not an appropriate vehicle for an attorney to 'vent his spleen'. . . ."].) "Ad hominem attacks and other invective detract from counsel's legal arguments, signal inappropriate personal embroilment in the dispute, and indicate an inability to engage in the reasoned analysis the courts need and counsel's clients deserve. When counsel resort to name-calling and to unsupported claims of misconduct, they risk obscuring any meritorious arguments they may have." (*WasteXperts, Inc. v. Arkaelian Enterprises*, *supra*, 103 Cal.App.5th at p. 667.) They also impose "a real cost to the opposing party and the state" (*Pierotti v. Torian, supra,* 81 Cal.App.4th at pp. 32-33), as both opposing counsel and the court must "spend additional resources filtering out the hyperbole." (*WasteXperts, Inc. v. Arkaelian Enterprises*, *supra*, 103 Cal.App.5th at p. 667.) Counsel can zealously dispute the facts of a case or the merits of a ruling without resorting to unprofessional vitriol, and would be well-advised to do so in the future.

## DISPOSITION

The order terminating the trust and distributing the real property contained therein is affirmed.  Gerald is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.


We concur:




MORI, J.


TAMZARIAN, J.